700 S.E.2d 302

**STATE of West Virginia, Appellee,**

v.

**JESSICA JANE M., Appellant.**

**No. 35441.**

Supreme Court of Appeals of
West Virginia.

Submitted Sept. 8, 2010.

Decided Sept. 16, 2010.

Michael C. Alberty, Esquire, Alberty Law Office, Wheeling, WV, for Appellant.

Gail W. Kahle, Esquire, Jenna Perkins Wood, Esquire, Ohio County Prosecutors Office, for Appellee.

PER CURIAM:

This is an appeal of a January 14, 2009, final order from the Circuit Court of Ohio County sentencing the defendant/appellant Jessica Jane M.[1] (hereinafter "Jessica M." or "defendant") to serve not less than 101 years, nor more than 235 years in the state penitentiary upon being convicted of three counts of first degree sexual assault, four counts of sexual abuse by a parent, three counts of incest, and one count of conspiracy. The defendant asserts that the trial court committed reversible error by (1) allowing the State to introduce hearsay statements the alleged victim made to her foster mother; (2) incorrectly applying our rape shield law by prohibiting the defendant from asking the alleged nine-year-old victim: "How many different men did you have sex with?"; (3) denying defense counsel's request to inquire as to the alleged victim's competency to testify at trial; and (4) denying defendant's motion to disqualify the Ohio County Prosecuting Attorney's Office due to previous contact between the defendant and certain members of the prosecutor's office in a separate matter.

After thorough review of the briefs, the legal authority cited and the record presented for consideration, we find that the circuit court committed no reversible error and therefore affirm the judgment of conviction and sentencing order.

I.

*Facts & Background*

The charges against the defendant stem from allegations made by her daughter, R.M.

1. The use of the defendant's last name would make her young daughter easily identifiable. We will therefore adhere to our usual practice and refer to the parties by their first names and last initials only. *See In re Clifford K.,* 217 W.Va. 625, 619 S.E.2d 138 (2005).

R.M. was born on December 28, 1998, and resided with her mother until February 28, 2006, when she and her two younger siblings were removed from her mother's residence due to allegations of abuse and neglect unrelated to the sexual abuse allegations that form the basis of this appeal.

R.M. and her siblings were placed in the foster home of Sally Keefer in August 2006.[2] A month after the children moved into her house, Sally Keefer observed R.M. "french kissing" her 18 month-old younger brother and engaging in other overt sexual conduct that she considered abnormal behavior for a seven-year old child. During October and November 2006, R.M. told Ms. Keefer that she had been sexually abused by her mother and her mother's boyfriend, Jack Jones[3], prior to being removed from her mother's house. Sally Keefer recorded these disclosures in a journal, contacted a DHHR (Department of Health and Human Resources) worker and requested that R.M. receive therapy to deal with this abuse.

R.M. also reported these sexual abuse allegations to Michelle Hogan, the CPS (Child Protective Services) worker assigned to handle her case. Ms. Hogan made an audio recording of an interview she conducted with R.M. in which R.M. described being sexually abused by her mother and her mother's boyfriend, Jack Jones.[4]

Following these sexual abuse disclosures, R.M. underwent a physical examination and a forensic interview on November 7, 2006. Dr. Joan Phillips performed the physical examination and determined that a portion of R.M.'s hymen "was totally gone, which is abnormal," and further testified that the absence of the hymen "is considered clear evidence of a penetrating trauma."

Maureen Runyon, a social worker who has worked exclusively with sexually abused children for the last eleven years, conducted the forensic interview. While R.M. denied the sexual abuse allegations during this interview, Ms. Runyon concluded that "based on the ... behavior and statements that she's made ... I felt like there had been some type of inappropriate sexual activity." In preparation for trial, Ms. Runyon reviewed R.M.'s history of sexual abuse disclosures and found them to be credible because of R.M.'s advanced sexual knowledge and the sensory details she provided. Ms. Runyon stated:

> [S]he also describes, again, what we call sensory details. She can tell you what it feels like. She can't know what it feels like to have a penis inside of her from watching it on TV. At one point she describes the ejaculation as being wet and sticky. Again, that's a sensory detail that tells me she had to have experienced that to be able to describe it in the type of detail that she does.

R.M. saw a psychologist, Dr. Sara Wyer, approximately twenty times beginning in the fall of 2006 and continuing through 2007. R.M. repeated the same allegations of being sexually abused by her mother and Jack Jones to Dr. Wyer. Dr. Wyer testified that she found R.M.'s disclosures to be credible "primarily based on the fact that she gave very detailed sensory descriptives. What things tasted like, looked like, felt like ... I felt that she had had direct experience with that."

Based on these sexual abuse allegations, an Ohio County grand jury returned a 14–count indictment against Jessica M. on January 14, 2008. This indictment included one count of felony conspiracy in violation of *W.Va.Code* § 61–10–31, four counts of felony sexual assault in the first degree in violation of *W.Va.Code* § 61–8B–3(a)(2), five counts of felony sexual abuse by a parent or custodian in violation of *W.Va.Code* § 61–8D–5(a), and four counts of felony incest in violation of *W.Va.Code* § 61–8–12(b).

---

**2.** Between February and August 2006, R.M. and her siblings were placed in a number of different foster homes.

**3.** Jack Jones was also charged with sexually assaulting R.M. He was tried and convicted separately from the defendant herein.

**4.** Ms. Hogan did not provide the exact date upon which this recording was made, but testified "I believe the disclosures may have started in September" of 2006.

The defendant's trial began on October 8, 2008, and lasted for three days. R.M. testified at the trial, stating that her mother held her down while Jack Jones raped her. R.M. also testified that her mother put her fingers inside of her vagina, made R.M. touch her breast, performed oral sex on R.M., and made R.M. perform oral sex on her.

The State called a number of witnesses who corroborated R.M.'s testimony including R.M.'s foster mother, Sally Keefer; R.M.'s CPS worker, Michelle Hogan; Dr. Phillips, whose physical findings showed "clear evidence of a penetrating trauma"; Maureen Runyon who conducted the forensic interview, reviewed R.M.'s history of sexual abuse disclosures and testified that she found R.M.'s allegations to be credible; and Dr. Sara Wyer, a psychologist who treated R.M. and found her allegations to be credible.

The State also called Connie Roy, a Licensed Professional Clinical Counselor at a residential treatment facility where R.M. spent five months receiving treatment.[5] Both Ms. Roy and a physician employed at the facility diagnosed R.M. with "post-traumatic stress disorder, chronic, and sexual abuse of child, focus on victim." Ms. Roy testified that the post-traumatic stress disorder was a result of the sexual abuse R.M. suffered. Ms. Roy further testified that R.M.'s behavior and the manner in which she made the sexual abuse disclosures were consistent with that of a child who has been sexually abused.

At the close of the State's case, the defendant moved for a directed verdict of acquittal on all fourteen counts in the indictment. The court dismissed counts five, ten, and fourteen of the indictment[6] and denied the defendant's motion as to the remaining eleven counts.

The defendant's case consisted of three witnesses. Jessica M. testified on her own behalf and denied the allegations her daughter made against her, stating that she never sexually abused her daughter and would not allow anyone else to sexually abuse her daughter. The defendant next called Dr. Michael Crabtree, an expert in psychology who testified that R.M.'s accusations were not credible and that the defendant did not fit the profile of a sex offender. The defendant's final witness was Dr. David Mosman, a pediatrician in Wheeling, West Virginia, who treated R.M. for a sore throat in November 2004. He testified that he only saw R.M. on one occasion and was not aware that R.M. had been sexually abused. On cross-examination, Dr. Mosman testified that he never performed a pelvic examination on R.M. because he was simply treating her for a sore throat.

The jury convicted the defendant on all eleven counts remaining in the indictment. On January 14, 2009, the circuit court sentenced the defendant to serve not less than 101 years, nor more than 235 years in the state penitentiary. The defendant appeals from this sentencing order.

## II.

### *Standard of Review*

Because the issues raised in the instant appeal require the application of separate and distinct standards of review, we incorporate such standards into our discussion of the issues to which they pertain.

## III.

### *Discussion*

The defendant raises four issues upon which she asserts the trial court committed reversible error: (1) allowing the State to introduce hearsay statements the alleged victim made to her foster mother, thereby violating the defendant's Sixth Amendment right to confrontation pursuant to *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004); (2) incorrectly applying our rape shield law by prohibiting the defendant from asking the alleged nine-year-

---

5. R.M. was an in-patient at this facility from March through August 2008.

6. These three counts charge the defendant with forcing R.M. to "penetrate the sexual organ of JESSICA M. with a foreign object for the pur-

pose of gratifying the sexual desire of JESSICA M...." The State failed to present sufficient evidence that this act occurred and conceded that these three counts were properly dismissed.

old victim: "How many different men did you have sex with?"; (3) denying defense counsel's request to inquire as to the alleged victim's competency to testify at trial; and (4) denying defendant's motion to disqualify the Ohio County Prosecuting Attorney's Office due to previous contact between the defendant and certain members of the prosecutor's office in a separate matter.

### A.(1)

### *Hearsay Statements*

■ The defendant first argues that the trial judge improperly permitted the State to introduce hearsay statements through the testimony of Sally Keefer, R.M.'s foster mother, about the sexual abuse disclosures R.M. revealed to her.

■ When reviewing a challenge to a trial court's admission of evidence, we apply the following standard of review: " '(r)ulings on the admissibility of evidence are largely within a trial court's sound discretion and should not be disturbed unless there has been an abuse of discretion.' *State v. Louk*, 171 W.Va. 639, 643, 301 S.E.2d 596, 599 (1983)." Syllabus Point 2, *State v. Peyatt*, 173 W.Va. 317, 315 S.E.2d 574 (1983). *See also* Syllabus Point 1, *State v. Pettrey*, 209 W.Va. 449, 549 S.E.2d 323 (2001).

■ In making a determination whether the testimony in question constitutes hearsay[7], we are guided by Syllabus Point 1 of *State v. Maynard*, 183 W.Va. 1, 393 S.E.2d 221 (1990), which states:

> Generally, out-of-court statements made by someone other than the declarant while testifying are not admissible unless: 1) the statement is not being offered for the truth of the matter asserted, but for some other

purpose such as motive, intent, state-of-mind, identification or reasonableness of the party's action; 2) the statement is not hearsay under the rules; or 3) the statement is hearsay but falls within an exception provided for in the rules.

With these standards in mind, we turn to the defendant's argument. During direct examination, the State asked R.M.'s foster mother about a November 22, 2006, journal entry documenting R.M.'s sexual abuse disclosure and she testified as follows:

> She was just going on about her business, getting a bath. I was getting the other two out, drying them off, and she just looked at me, and said, "Sally, can I tell you something?" I said, "Yes." She said, "Jack did touch my privates."

Defense counsel objected to this testimony, arguing that it was impermissible hearsay. The trial judge initially agreed and stated that if it was being offered for the truth of the matter asserted, the objection would be sustained. The State argued that it should be permitted to show the child's advanced sexual knowledge. The trial judge agreed with the State and gave the jury the following instruction:

> Ladies and gentlemen, please disregard the witness's last answer. These statements regarding what's in the journal, as I understand it, are not being offered for the truth of the matter asserted within the statements.

Based on this ruling, the State continued asking R.M.'s foster mother questions about the sexual disclosures R.M. made which were recorded in the foster mother's journal. The trial judge gave defense counsel a continuing objection to these questions,[8] gave two more

---

7. "Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.
W.Va.R.Evid. 801(c).

8. An example of this line of questioning is as follows:
> Q. So she had a code word for her private area?
> A. Yes. I never told her nothing and you know, if I would've referred to anything with any of the children, it would've been their

pee-bug or private area. She used the word "coochie" and penis.
> Q. Okay. So "coochie" was not a term that you came up with?
> A. No.
> Q. So I think you said that she described her mother using her tongue?
> A. Yes. And so I asked her, "What did your mother do with her tongue?" And she said that she would move it up and down and she would ask her if it felt good and did she like it. And R.M. said she said yes because she was scared to tell her mother no.

instructions to the jury that this testimony was not to be considered for the truth of the matter asserted and instructed them, "(a)s I understand it, they are being offered to demonstrate sexual knowledge possessed by R.M."

After reviewing the entire record, we conclude that the trial judge did not abuse his discretion by permitting Sally Keefer to testify regarding R.M.'s sexual abuse disclosures. In *State v. Edward Charles L.*, 183 W.Va. 641, 398 S.E.2d 123 (1990), and *State v. James B., Sr.*, 204 W.Va. 48, 511 S.E.2d 459 (1998), we addressed the admissibility of statements a child who had allegedly been sexually abused made to their mother or foster mother. In *Edward Charles L.*, we upheld the admissibility of this kind of statement under *West Virginia Rule of Evidence* 803(24), the catch-all exception to the hearsay rule, stating that:

> [T]he mother's testimony was properly admitted at trial by the lower court, since the children were present to testify and be cross-examined; the mother added nothing substantive to the children's direct testimony, and primarily related the child's statements not to prove the truth of the matter asserted, but to explain why she took them to the psychologist[.]

*Edward Charles L.*, 183 W.Va. at 657, 398 S.E.2d at 139.

We further determined in *Edward Charles L.*, that "the statements comport to this hearsay exception and the general rules of evidence because they not only meet the relevancy and probativeness requirements but the fact that the children testified at trial and were subject to cross-examination ameliorates the real risks of admitting hearsay." *Id.* 183 W.Va. at 656, 398 S.E.2d at 138.

Similarly, in *James B., Sr.*, we reviewed testimony by a foster mother who testified about a child being made to perform sexual acts with his biological mother and stepfather, James B., Sr. This Court determined that the foster mother's testimony was not hearsay because it was offered not for the truth of the matter asserted, but to explain why the foster mother contacted the authorities. In *James B., Sr.*, the trial court gave a limiting instruction to the jury and told them

to consider the testimony for that limited purpose. As in *Edward Charles L.*, one of the main reasons this Court upheld the trial court's ruling in *James B., Sr.*, was that the child testified at trial, thus ameliorating the real risk of admitting hearsay.

In the present case, R.M. testified at trial. Consistent with *Edward Charles L.*, and *James B., Sr.*, this ameliorates the real risk of admitting the alleged hearsay statements made by R.M.'s foster mother. There was a thorough cross-examination as to the sexual abuse allegations R.M. made against her mother. We therefore find that the trial judge did not abuse his discretion by allowing R.M.'s foster mother to testify as to R.M.'s disclosures of sexual abuse recorded in her journal.

### A.(2)

### *Alleged Crawford Violation*

■ The defendant next argues that her Sixth Amendment right to confrontation was violated when the State was permitted to ask R.M.'s foster mother about her journal entries documenting R.M.'s sexual abuse disclosures. In support of her argument, the defendant relies on *Crawford v. Washington, supra.*

In *Crawford* the defendant was convicted of assault. The evidence used to support the conviction included a tape-recorded incriminating statement given to the police by the defendant's wife. *The defendant's wife did not testify at the trial.* The defendant argued that the statement should not have been admitted because he was not afforded an opportunity to confront his wife regarding the statement. The trial court allowed the statement to be introduced. On appeal, the Washington Court of Appeals reversed on the grounds that the statement was improperly admitted into evidence. However, the Washington Supreme Court reversed after finding the statement was properly admitted.

The United States Supreme Court agreed to hear the case to determine whether introduction of the statement violated the defendant's Sixth Amendment right to confront witnesses against him. The Supreme Court

found that the statement should not have been allowed into evidence, stating "[t]estimonial statements of witnesses *absent from trial* [are admissible] only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Crawford*, 541 U.S. at 59, 124 S.Ct. at 1369, 158 L.Ed.2d 177. (Emphasis added).

■ We interpreted *Crawford* in *State v. Mechling*, 219 W.Va. 366, 633 S.E.2d 311 (2006), finding:

Pursuant to *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the Confrontation Clause contained within the Sixth Amendment to the *United States Constitution* and Section 14 of Article III of the *West Virginia Constitution* bars the admission of a testimonial statement *by a witness who does not appear at trial*, unless the witness is unavailable to testify and the accused had a prior opportunity to cross-examine the witness.

Syllabus Point 6, *State v. Mechling, supra.* (Emphasis added).

*Mechling* further explained that "only 'testimonial statements' cause the declarant to be a 'witness' subject to the constraints of the Confrontation Clause. Non-testimonial statements by an unavailable declarant, on the other hand, are not precluded from use by the Confrontation Clause." 219 W.Va. at 373, 633 S.E.2d at 318.

In the case *sub judice*, the defendant argues that the trial court erred by failing to determine whether the statements recorded in R.M.'s foster mother's journal were testimonial or non-testimonial.[9] The defendant argues that these statements were testimonial and that her Sixth Amendment right to confront a witness against her was violated. We disagree. Assuming, as urged by the defendant, that the statements recorded in the foster mother's journal are testimonial, the defendant's argument fails because R.M. was the out-of-court declarant and R.M. testified at trial. *Crawford* and *Mechling* bar the admission of a testimonial statement *by a witness who does not appear at trial*, unless the witness is unavailable to testify and the accused had a prior opportunity to cross-examine the witness. The defendant's Sixth Amendment right to confront and cross-examine R.M. was satisfied because she testified and was cross-examined.

The defendant acknowledges that R.M. testified at trial, but argues that the trial judge severely limited her cross-examination of R.M. and would not allow defense counsel to ask her about the sexual abuse disclosures R.M. made to her foster mother. The trial judge limited the defendant's cross-examination of R.M. to "the areas that were brought up on direct examination."[10] During the State's direct examination of R.M., the following exchange took place:

State: Okay. You talked to Sally, your foster mom, about these things that happened to you; right?

R.M.: Yes.

Since the State inquired about R.M.'s discussions with her foster mother during direct examination, the defendant could have asked

**9.** *Crawford* did not provide a clear definition of 'testimonial statements', but it did provide examples of the types of statements that can be considered 'testimonial':

Various formulations of this core class of "testimonial" statements exist: *ex parte* in-court testimony or its functional equivalent-that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially[;] extrajudicial statements ... contained in formalized testimonial materials such as affidavits, depositions, prior testimony, or confessions[;] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial. These formulations all share a common nucleus and then define the Clause's coverage at various levels of abstraction around it. Regardless of the precise articulation, some statements qualify under any definition-for example, *ex parte* testimony at a preliminary hearing.

Statements taken by police officers in the course of interrogations are also testimonial under even a narrow standard.

*Crawford*, 541 U.S. at 51–52, 124 S.Ct. at 1364 (quotations and citations omitted).

**10.** The trial judge made this statement in the context of ruling on whether the defendant could ask R.M. "How many different men did you have sex with?" This will be discussed at length in section III. B. *infra.*

about these discussions during cross-examination. We therefore find that the defendant's cross-examination of R.M. was not substantially limited by the trial judge's ruling confining her to the areas that were brought up on direct examination.

## B.

### *Rape Shield*

■ The defendant's next argument is that the trial court abused its discretion when it sustained the State's objection to the following question defense counsel posed to R.M.: "How many different men did you have sex with?" The trial court determined that this question was prohibited by West Virginia's rape shield law, which encompasses both *W.Va.Code* § 61–8B–11 [1986][11] and *West Virginia Rules of Evidence* 404(a)(3)[1994][12]. In this opinion we will refer to both the statute and the rule, considered *in pari materia*, as West Virginia's "rape shield law."

Our standard of review when considering a rape shield challenge is twofold. First, an interpretation of the *West Virginia Rules of Evidence* presents a question of law subject to *de novo* review. Second, a trial court's ruling on the admissibility of testimony is

reviewed for an abuse of discretion, but to the extent the circuit court's ruling turns on an interpretation of the *West Virginia Rules of Evidence*, our review is plenary. *State v. Sutphin*, 195 W.Va. 551, 560, 466 S.E.2d 402, 411 (1995).

Following the State's objection to the question, "How many different men did you have sex with?", the parties discussed the objection at the bench:

State: This violated—violates the Rape Shield Statute. There's no—I mean, if he's—there's no reason to ask this question of this child, and to ask it about men—or how many she had sex with. There's no evidence in this case that she has had sexual relations with anyone. Certainly not consensual. Or whether she's been perpetrated by anyone else other than her mother. It's not admissible. If there's no claimed injury for which there has to be identification or a disease or such—I mean, it is what it is, your Honor.

Defense Counsel: Your Honor, this child, according to the records the prosecutor's office provided to me, has named numerous individuals that's had sex with—that raped her.

State: Your Honor, that's misrepresenting the evidence.

---

11. *W.Va.Code* § 61–8B–11 [1986] states:

(a) In any prosecution under this article in which the victim's lack of consent is based solely on the incapacity to consent because such victim was below a critical age, evidence of specific instances of the victim's sexual conduct, opinion evidence of the victim's sexual conduct and reputation evidence of the victim's sexual conduct shall not be admissible. In any other prosecution under this article, evidence of specific instances of the victim's prior sexual conduct with the defendant shall be admissible on the issue of consent: Provided, That such evidence heard first out of the presence of the jury is found by the judge to be relevant.
(b) In any prosecution under this article evidence of specific instances of the victim's sexual conduct with persons other than the defendant, opinion evidence of the victim's sexual conduct and reputation evidence of the victim's sexual conduct shall not be admissible: Provided, That such evidence shall be admissible solely for the purpose of impeaching credibility, if the victim first makes his or her previous sexual conduct an issue in the trial by introducing evidence with respect thereto.

(c) In any prosecution under this article, neither age nor mental capacity of the victim shall preclude the victim from testifying.
(d) At any stage of the proceedings, in any prosecution under this article, the court may permit a child who is eleven years old or less to use anatomically correct dolls, mannequins or drawings to assist such child in testifying.

12. *West Virginia Rules of Evidence* 404(a)(3)[1994] states in pertinent part;

(a) *Character evidence generally.*—Evidence of a person's character or a trait of character is not admissible for the purpose of proving that he or she acted in conformity therewith on a particular occasion, except: ...
(3) Character of victim of a sexual offense.—In a case charging criminal sexual misconduct, evidence of the victim's past sexual conduct with the defendant as provided for in W.Va. Code § 61–8B–11; and as to the victim's prior sexual conduct with persons other than the defendant, where the court determines at a hearing out of the presence of the jury that such evidence is specifically related to the act or acts for which the defendant is charged and is necessary to prevent manifest injustice[.]

Defense Counsel: You just cannot—you just can't bring a child—you just can't bring a child in here and ask a series of questions that the answer is yes, yes, yes, and then say, whoops, I can't probe this. I still contend that this child may be incompetent to testify. She'd look up while I'm asking the questions—she's obviously looking to Ms. Wood (prosecuting attorney).

State: Oh, my. This has nothing to do with competency. It has to do with the truthful answers. She's nine.

The Court: The objection is going to be sustained. You may inquire as to whatever conduct of a sexual nature she described in her direct testimony.

State: Thank you.

Defense Counsel: I can't go into her grandfather, her uncle, any of those people?

State: Your honor, the scope of direct.

The Court: You can—the sexual acts that she testified to on direct.

■ The defendant alleges that the trial court committed error when it "prohibited defense counsel from soliciting testimony and introducing evidence of the falsity of R.M.'s other accusations of sexual assault and abuse against different family members." In Syllabus Point 3 of *State v. Quinn*, 200 W.Va. 432, 490 S.E.2d 34 (1997), we set forth the procedure a defendant must follow in order to cross-examine an alleged sexual assault victim regarding other statements she has made about being the victim of sexual misconduct:

A defendant who wishes to cross-examine an alleged victim of a sexual offense about or otherwise introduce evidence about other statements that the alleged victim has made about being the victim of sexual misconduct *must initially present evidence regarding the statements to the court out of the presence of the jury and with fair notice to the prosecution,* which presentation may in the court's discretion be limited to proffer, affidavit, or other method that properly protects both the

rights of the defendant and the alleged victim and effectuates the purpose of our rape shield law, *W.Va.Code* § 61–8B–11 [1986] and *West Virginia Rules of Evidence* 404(a)(3)[1994].

(Emphasis added).

In *Quinn,* the appellant was convicted of sexual misconduct by a custodian of a five-year-old child. The issue in *Quinn* was whether our rape shield law applied to bar the victim's alleged false statements of abuse by other perpetrators. The appellant sought to use this evidence to prove that the victim had falsely accused others in the same fashion that she falsely accused him. The appellant argued that the rape shield law did not apply to the victim's statements because they were false, and therefore were not evidence of the child's sexual conduct. Rather, they were evidence of the child's false statement of sexual abuse when there had been none. This Court set forth the following standard in Syllabus Point 2 of *Quinn* to determine whether such evidence fell outside the scope of our rape shield:

Requiring strong and substantial proof of the actual falsity of an alleged victim's other statements is necessary to reasonably minimize the possibility that evidence which is within the scope of our rape shield law *W.Va.Code* § 61–8B–11 [1986] and *West Virginia Rules of Evidence* 404(a)(3) [1994], is not erroneously considered outside of its scope.

In the case *sub judice,* the defendant did not request a hearing outside the presence of the jury, as mandated by Syllabus Point 3 of *Quinn,* to present evidence demonstrating that R.M. had previously made false statements that she had been sexually abused by other perpetrators.[13] The defendant never presented the trial court with any evidence that R.M. made *false* sexual abuse allegations against other people. Defense counsel failed to inform the trial judge during the discussion at the bench following the State's objection that his proposed line of questioning was

---

**13.** Prior to trial, the defendant requested an *in camera* hearing to determine whether R.M. was "capable of testifying in a truthful, credible, reality based, factual, historically correct, delusionary free and mentally distorted free manor [sic]."

As will be discussed at length in Section III. C., this proposed hearing was to determine whether R.M. was "competent and credible to testify at trial."

intended to explore *false accusations* R.M. allegedly made. Instead, defense counsel simply stated, "this child, according to the records the prosecutor's office provided to me, has named numerous individuals that's had sex with—that raped her." [14] This assertion, with no citation to the record, no proffer, affidavit or live witness to testify to R.M.'s alleged false prior accusations, falls far short of meeting the "strong and substantial proof of actual falsity" threshold we established in *Quinn.*

Despite her failure to comply with the *Quinn* threshold requirements, the defendant argues that the trial judge erred in view of the holding in *Barbe v. McBride,* 521 F.3d 443 (4th Cir.2008). *Barbe* held that, under the *Rock–Lucas*[15] principle, a state court ruling on the admissibility of evidence under a rape shield law must forgo the application of any *per se* rule in favor of a case-by-case assessment of whether the relevant exclu-

sionary rule "is arbitrary or disproportionate" to the State's legitimate interests. The defendant argues that the trial judge erred by failing to consider the specific facts of R.M.'s alleged other allegations and thereby violated *Barbe.*

■ *Barbe* is distinguishable from the instant case because the defendant herein failed to provide the trial court with an adequate evidentiary presentation alleging that R.M. previously made false accusations of sexual abuse against other perpetrators. *Barbe* was decided after *Quinn,* discussed our ruling therein and declined to cast doubt on our mandatory requirement that a defendant seeking to cross-examine an alleged victim about a prior false accusation must first present the court with an adequate evidentiary presentation outside the presence of the jury and with fair notice to the prosecution. In order for a trial court to comply with

14. Our review of the record indicates that there is little evidentiary support for the defendant's contention that R.M. "named numerous individuals that ... raped her." The defendant asserts that R.M. accused her grandfather, her uncle, a boyfriend of her mother's named David Burch, and another man named William of sexually abusing her. The allegation against her grandfather and uncle did not come from R.M. Rather, when the police interviewed the defendant's boyfriend and co-conspirator, Jack Jones, he stated that R.M. had previously had sexual encounters with her uncle and her grandfather. The defendant fails to cite anywhere in the record where R.M. personally made this claim.

The defendant also discusses an alleged dream R.M. had in which the police officer who interviewed her handcuffed and raped her. Again, this allegation came not from R.M., but from the statement Jack Jones made to the police.

R.M. did discuss David Burch and William (no last name given), men her mother had previously dated. R.M. told her CPS worker that David Burch and William would "whoop my butt." When asked if these men did anything else to her, she replied no, "they would smack my butt though." R.M.'s foster mother asked her if anyone else ever touched her "privates," and she replied "Yes, David Burch did." R.M. does not elaborate on this answer and it is unclear from this exchange whether R.M. meant that Burch had done anything more than spanking her buttocks. R.M. told her psychologist, Sara Wyer, that Burch and William were boyfriends of her mother, but did not report that she had been sexually abused by either of them.

By contrast, R.M. made the allegations against her mother and Jack Jones to her foster mother,

her CPS worker, her psychologist, and her counselor at the residential treatment facility, as well as testifying to these allegations in court.

We further note that while the defendant was not permitted to cross-examine R.M. about these alleged other individuals who raped her, the defendant explored this issue with numerous witnesses throughout the trial and discussed it during both opening and closing argument. The defendant explored this issue with Sara Wyer, R.M.'s psychologist; Dr. Joan Phillips, who conducted the physical examination; Maureen Runyon, who conducted the forensic interview; and Michelle Hogan, R.M.'s CPS worker. During opening argument, defense counsel stated:

So there's a whole laundry list of people she's making these allegations on. Only two are being charged with anything, my client and her ex-boyfriend. Pap–Pap—if we're going to believe this child, if this child is not a liar—Pap-Pap is not charged with anything. David Burch isn't charged with anything. Michael, whoever that is, isn't charged with anything.

Defense counsel continued this theme in his closing argument, stating:

I agree with Mr. Kahle (prosecutor) that this is a shame and this child should be innocent and, you know, she should be intact. I don't know why she's unintact. Maybe she put her own fingers in there. Maybe somebody else put fingers in there. Maybe William, David, all these names that were thrown around in this case had something to do with it.

15. *Rock v. Arkansas,* 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987); *Michigan v. Lucas,* 500 U.S. 145, 111 S.Ct. 1743, 114 L.Ed.2d 205 (1991).

*Barbe* and conduct a case-by-case assessment of the facts to determine whether the relevant exclusionary rule is arbitrary or disproportionate to the State's legitimate interests, it must first be presented with an adequate evidentiary presentation.[16]

Because the defendant in the instant case failed to make an adequate evidentiary presentation, as mandated by *Quinn*, we find that the trial court did not commit error. In view of the defendant's failure to follow *Quinn*, permitting defense counsel to ask R.M., "How many men have you had sex with?" would defy the letter and spirit of our rape shield law.

## C.

### *Competency Issue*

 The defendant next alleges that the trial court "abused its discretion and created plain error when it prohibited defense counsel from questioning R.M. regarding certain facts that would demonstrate her inability to testify as a competent witness."

 Our standard of review when examining whether a witness is competent to testify can be found in Syllabus Point 10 of *State v. Pettrey*, 209 W.Va. 449, 549 S.E.2d 323 (2001):

"The question of the competency of a witness to testify is left largely to the discretion of the trial court and its judgment will not be disturbed unless shown to have been plainly abused resulting in manifest error." Syllabus Point 8, *State v. Wilson*, 157 W.Va. 1036, 207 S.E.2d 174 (1974).

Our rape shield law plainly states that, "[i]n any prosecution under this article, neither age nor mental capacity of the victim shall preclude the victim from testifying." *W.Va.Code* § 61–8B–11(c) [1986].[17]

We are also guided by *Wheeler v. United States*, 159 U.S. 523, 16 S.Ct. 93, 40 L.Ed. 244 (1895), in which the United States Supreme Court gave direction on how courts should evaluate the competency of a child witness:

[T]here is no precise age which determines the question of competency. This depends on the capacity and intelligence of the child, his appreciation of the difference between truth and falsehood, as well as his duty to tell the former. The decision of this question rests primarily with the trial judge, who sees the proposed witness, notices his manner, his apparent possession or lack of intelligence, and may resort to any examination which will tend to disclose his capacity and intelligence as well as his understanding of the obligations of an

---

16. To summarize, three steps are required in determining whether a defendant may cross-examine an alleged sexual assault victim regarding other alleged false statements she has made about being the victim of sexual misconduct. First, the defendant must comply with Syllabus Point 3 of *Quinn* and present the court with a meaningful "proffer, affidavit, or other method that properly protects both the rights of the defendant and the alleged victim." If the defendant fails to comply with this requirement, the court can not perform steps two and three of this analysis.

The second step is for the court to determine whether the defendant has met the threshold set forth in Syllabus Point 2 of *Quinn* and presented "strong and substantial proof of the actual falsity of an alleged victim's other statements." If the defendant has met that threshold, then the false statements will not be excluded pursuant to our rape shield law. If the court determines that a defendant has not met this threshold, it must move on to the third step of the analysis.

The third step, consistent with *Barbe*, is for a court that determines the falsity exception does

not apply, to then conduct a case-by-case assessment and perform the balancing test we set forth in Syllabus Point 6 of *State v. Guthrie*, 205 W.Va. 326, 518 S.E.2d 83 (1999), to determine whether the exclusion of the proffered evidence under our rape shield law violates a defendant's due process right to a fair trial. Syllabus Point 6 of *State v. Guthrie*, 205 W.Va. 326, 518 S.E.2d 83 (1999), states:

The test used to determine whether a trial court's exclusion of proffered evidence under our rape shield law violated a defendant's due process right to a fair trial is (1) whether that testimony was relevant; (2) whether the probative value of the evidence outweighed its prejudicial effect; and (3) whether the State's compelling interests in excluding the evidence outweighed the defendant's right to present relevant evidence supportive of his or her defense. Under this test, we will reverse a trial court's ruling only if there has been a clear abuse of discretion.

17. *W.Va.Code* § 61–8B–11 [1986] is quoted in full in footnote 11.

oath. As many of these matters cannot be photographed into the record, the decision of the trial judge will not be disturbed on review unless from that which is preserved it is clear that it was erroneous.

159 U.S. at 524–525, 16 S.Ct. at 93.

Consistent with this "clearly erroneous" standard, this Court has consistently held that the decision to allow or to refuse to allow a child's testimony is within the sound discretion of the trial judge and will not be reversed on appeal unless there is a clear showing of abuse of discretion.[18]

Applying these principles to the instant case, we first note that before R.M. testified, the trial judge engaged in a conversation with her to determine if she was competent to testify. This examination revealed that R.M. had the capacity and intelligence to understand that she had the duty to be truthful.

Based on this conversation and a review of R.M.'s testimony, we find the trial court did not commit error by allowing R.M. to testify. R.M. testified about being sexually assaulted in detail, including the following exchange during cross-examination in which she describes her mother holding her down while Jack Jones raped her:

Q. Now, R., you mentioned earlier somebody held you down; is that correct?

R.M. Yes.

Q. Okay. Who did that?

R.M. My mom.

Q. Okay. And why did she do that?

R.M. (No response).

Q. Let me ask you another question. What happened when she held you down?

R.M. I was screaming and kicking.

Q. Now, where were you when all this was happening?

R.M. At my mom's place, Hil-dar.... It was an apartment thing ... the place where we lived in Hil-dar had an up- stairs and a downstairs.

This exchange illustrates that R.M. was able to describe what happened to her, where it happened and how she responded. The only question she was unable to answer called for her to speculate on her mother's motivation for sexually abusing her ("And why did she do that?"). While there were other questions R.M. was not able to fully answer, a review of the entirety of her testimony reveals that she was competent to testify. On the occasions she had difficulty answering certain questions, this was an issue of credibility for the jury to weigh, not an issue of competency. We are satisfied that the trial judge was in the best position to evaluate R.M.'s competency and we find no abuse of discretion on this issue.

### D.

### *Motion to Disqualify Ohio County Prosecutor's Office*

█ The defendant's final assignment of error is that the trial court erred when it denied her motion to disqualify the Ohio County Prosecutor's Office. The trial court's order denying this motion sets forth the following facts:

The motion is based upon past dealings between the Prosecuting Attorney's office and Jessica M. The first contact that Jessica M. had with the Prosecuting Attorney's office in the past was in the capacity as a victim of domestic violence. She sought assistance and advice from that office on more than one occasion, and was advised to seek a protection from domestic violence order. On several occasions, Assistant Prosecuting Attorney Gail Kahle personally met with Jessica M. regarding her allegations of domestic violence. Attorney Kahle is one of two Assistant Prosecuting Attorneys assigned to the Jessica M. criminal case.

Additionally, the Prosecuting Attorney's office has been involved in abuse and neglect proceedings involving Jessica M. as a Respondent, as well as Respondent Jack

**18.** See, *State v. Watson,* 173 W.Va. 553, 318 S.E.2d 603 (1984); *State v. Carter,* 168 W.Va. 90, 282 S.E.2d 277 (1981); *State v. Ayers,* 179 W.Va. 365, 369 S.E.2d 22 (1988); *State v. Price,* 96 W.Va. 498, 123 S.E. 283 (1924).

Jones, who is the alleged perpetrator of domestic violence against Jessica M.

The defendant alleges that these contacts between herself and members of the prosecuting attorney's office created an appearance of impropriety. The defendant further alleges that the prosecuting attorney's office may have acquired evidence through these meetings that it used against her in the present criminal matter.

■ In Syllabus Point 1 of *Nicholas v. Sammons*, 178 W.Va. 631, 363 S.E.2d 516 (1987), we stated,

> Prosecutorial disqualification can be divided into two major categories. The first is where the prosecutor has had some attorney-client relationship with the parties involved whereby he obtained privileged information that may be adverse to the defendant's interest in regard to the pending criminal charges. A second category is where the prosecutor has some direct personal interest arising from animosity, a financial interest, kinship, or close friendship such that his objectivity and impartiality are called into question.

■ This Court has also indicated that whether a trial court should disqualify a prosecutor, or his office, from prosecuting a criminal defendant is reviewed under an abuse of discretion standard. *State v. Keenan*, 213 W.Va. 557, 584 S.E.2d 191 (2003). *See also State v. Britton*, 157 W.Va. 711, 203 S.E.2d 462 (1974).

The trial court conducted a hearing on this matter and issued a detailed order, addressing each of the defendant's arguments. The trial court concluded that while Prosecutor Kahle met with Jessica M., he never acted as her attorney. Rather, he was acting in his capacity as an assistant prosecutor, assisting the victim of an alleged crime. There was never an agreement stating that Prosecutor Kahle represented the defendant, nor did he ever appear in court on her behalf. One of the reasons the trial court was unwilling to conclude that a prosecutor advising an alleged domestic violence victim created an attorney-client relationship was that:

> To find otherwise would create a chilling effect that would negatively impact the willingness of attorneys working in Prosecuting Attorney's offices to assist the victims of domestic violence.

The trial court next determined that the defendant failed to demonstrate that her previous meetings with Prosecutor Kahle created the appearance of impropriety. The meetings between the defendant and the prosecutor's office resulted in domestic violence charges against Jack Jones. The trial court found that these domestic violence charges were unrelated to the sexual abuse charges Jessica M. faces in the instant case. Finally, the trial court determined that the defendant failed to show that she divulged anything to Prosecutor Kahle during her interactions with him that would be adverse to her interests in the sexual abuse criminal proceedings.

Our review of the record indicates that the trial court did not abuse its discretion by denying the defendant's motion to disqualify the Ohio County Prosecutor's Office. Prosecutor Kahle assisted the defendant, an alleged domestic violence victim, in his capacity as an assistant prosecuting attorney. He later brought criminal charges against her when her daughter accused her of sexually abusing her. The defendant failed to show that the prosecutor's office acquired any information in its earlier meetings that were adverse to her interests in the instant case. In view of these circumstances, this Court cannot find that the trial court abused its discretion by refusing to disqualify the Ohio County Prosecutor's Office.

## IV.

### Conclusion

Based on the foregoing, the judgment of the Circuit Court of Ohio County is hereby affirmed.

Affirmed.