# STATE OF WEST VIRGINIA
# SUPREME COURT OF APPEALS

**State of West Virginia,**
**Plaintiff Below, Respondent**

**vs.)  No. 21-0389** (Fayette County 19-F-106)

**Brian S. Willis,**
**Defendant Below, Petitioner**

## MEMORANDUM DECISION

Petitioner Brian S. Willis, by counsel G. Todd Houck, appeals the Circuit Court of Fayette County's April 29, 2021, order sentencing him to consecutive terms of incarceration of life, without the possibility of parole, for each of his two first-degree murder convictions, to not less than one nor more than five years for his conspiracy conviction, and to twenty years for his arson conviction. Respondent State of West Virginia, by counsel Patrick Morrisey and Scott E. Johnson, filed a response in support of the circuit court's sentencing order.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

On November 4, 2016, Steven Skaggs and Stephanie Watters were shot and killed in their home. Two days later, before their bodies were found, their home was set on fire. Several years later, in May of 2019, petitioner, Charles Gill, and Charles Gill's father, Everett Gill, were indicted for their respective roles in these crimes: petitioner and Charles Gill were each charged with the first-degree murders of Ms. Watters and Mr. Skaggs, conspiracy, and first-degree arson; and Everett Gill was charged with conspiracy.

Prior to petitioner's trial, the Gills entered into plea agreements with the State. Charles pled guilty to two counts of voluntary manslaughter and one count of second-degree arson, and he agreed to cooperate with the State's case against petitioner. Everett pled guilty to conspiracy and likewise agreed to cooperate with the State's case against petitioner.

On March 8, 2021, the day before petitioner's trial was scheduled to begin, petitioner filed a "Motion to Recuse and Disqualify the Fayette County Prosecuting Attorney's Office from the

1

herein case." Petitioner argued that, in reviewing discovery produced in January of 2021, he learned that one of the State's anticipated witnesses, Deshaylin McGraw, was previously represented by Anthony Ciliberti ("Prosecutor Ciliberti"), who had since been elected Fayette County prosecuting attorney. While represented by Prosecutor Ciliberti, Ms. McGraw entered into a pretrial diversion agreement, under which she agreed to cooperate with the State's prosecution of petitioner and the Gills. Petitioner alleged that, due to Prosecutor Ciliberti's prior representation of Ms. McGraw and his current role as prosecutor, a conflict of interest was apparent.

Petitioner further argued that "[a]dditional compromise and conflict is apparent" because, as Ms. McGraw's prior attorney, Prosecutor Ciliberti would have "more information and information of a confidential nature about Ms. McGraw and her involvements in this case or other crimes," but his duty of confidentiality would prevent him "from discussing any and all evidence as required by *Brady v. Maryland*, 373 U.S. 8[3] (1963), and its progeny."[1]

Petitioner's motion was heard on the same day it was filed. The State responded that Ms. McGraw was disclosed as a witness in May of 2019, the pretrial diversion was dismissed in November of 2020, and Prosecutor Ciliberti no longer represented Ms. McGraw.[2] The State further represented that Prosecutor Ciliberti had had no involvement in petitioner's case.

The court denied petitioner's motion, finding that

all charges against [Ms. McGraw] ha[ve] been dismissed. And, her name does not come as a surprise to [petitioner's counsel]. I guess the surprise to [petitioner's counsel] is discovering who her lawyer was back at the time that her case was pending, but her case is no longer pending. She would have to have a new lawyer if she doesn't comply with the terms of the agreement.

Trial began on March 9, 2021. In all, fifteen witnesses testified on the State's behalf. Various law enforcement officers, forensic analysts, and fire investigators testified, and these witnesses testified generally to the investigation into the crimes and the analysis of the evidence collected. Investigators concluded that the fire at the victims' residence was caused by arson and that gasoline had been "poured or place[d] in the bedroom area and the living area," which is where the victims' bodies were found, and the victims' were found to have each died of a gunshot wound to the head prior to the fire being started.

Petitioner's statements to the police were played for the jury. In his first, he claimed that Charles Gill murdered the victims and that he (petitioner) was not present; in his second, he claimed that he was present but that Charles was solely responsible for the murders and that, aside from the Gills' prior "posturing," he had no knowledge of Charles's specific intentions when they got to the victims' home on the evening of the murders.

---

[1] In *Brady v. Maryland*, 373 U.S. 83 (1963), the Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87.

[2] The record reflects that the charges were actually dismissed in December of 2020.

The Gills also testified for the State. Charles admitted that he shot Mr. Skaggs and Ms. Watters, but he stated that his father and petitioner were also involved in the plan to kill the victims. The three referred to their plan as the "clean air act," and they discussed it "countless times." Petitioner was angry with the victims because they had stolen drugs and money from him, while the Gills were angry because the victims had stolen thousands of dollars' worth of tools from them.[3]

Charles testified that the talk behind the "clean air act" proceeded to action because petitioner reportedly told Charles that he and his father were "going to prison, along with [petitioner], for a very long time." Petitioner told Charles that law enforcement "had paperwork" on the three "for [petitioner] selling weed and us [(the Gills)] making meth": "He said they had wired buys on him. He said they got records of me signing for Sudafed boxes, which you have to do to get—you have to sign for the pseudoephedrine at the pharmacy."

On the night of the murders, Charles testified that he and petitioner were "really drunk," having consumed cocaine and liquor at petitioner's home "[f]or at least [ten] hours." Charles recounted,

> We was just really drunk and just partying, but [petitioner] kept pushing it on me, he had brought it up again, like he had countless times before that they got to go or we are going to prison. And he kept pushing it that night, like he had been and he had it set in his mind that night that we was going to go down there and kill 'em.

At petitioner's direction, he and Charles put tape on the soles of their shoes so they "would leave no traces," and the two left petitioner's home. Charles had "a sawed-off 20[-]guage shotgun" and petitioner had "[a] 9 mm [Ruger] pistol."

After they arrived at the victims' residence, Charles said he knocked on the door, but no one answered, so he

> just—the door opened right up—I turned the knob and it just opened right up. And I seen Stevie [Skaggs] laying there and whenever he was sitting in a chair about like—like a camping chair, and whenever I went in I just—I shot him right in the head . . . [u]p through the nose into the head.

Charles fired the shot as petitioner "was coming in right behind me." Petitioner then "[f]ired two shots" with his Ruger "towards Stevie [Skaggs]," but Charles was unsure whether "it hit him or not."

Next, Charles walked to the back bedroom, where he found Ms. Watters sleeping in bed. He testified that he "shot Stephanie right in the head." Charles walked out of the bedroom, but petitioner instructed him to "make sure she's dead," so Charles "loaded the shotgun again and I

---

[3] Another friend of petitioner's, Ryan McCloskey, also testified that petitioner claimed the Gills killed the victims over stolen drugs and tools and due to Ms. Watters's alleged work as a confidential informant.

went back in and shot her again and walked back out." The two then left the victims' residence and hid their guns in ditches on the way back to petitioner's home. At petitioner's home, petitioner threatened that if Charles "mentioned anything about it [petitioner] was going to kill me or my family."

Charles testified further that, the day after the murders, he and petitioner discussed the need to get rid of the evidence at the victims' home. Petitioner provided Charles with gas and oil, and, "[l]ike [two] days" after murdering Mr. Skaggs and Ms. Watters, Charles "dumped gas—a mixture of gas and oil throughout [the victims'] house, lit it on fire and left the door open."[4]

During Everett Gill's testimony, he recounted that, in 2016, the victims were "getting on drugs pretty heavy and everything and they got to stealing my tools—everything I owned—about $10,000 worth." Everett testified to the "clean air act," and he recalled petitioner stating that the victims were informants working for the police. Everett also testified to hearing petitioner complain that Ms. Watters had ripped him off.

According to Everett, within a few days of the murders, petitioner told Everett that he and Charles

> went down there and they opened the door and they went in there and they was high and passed out—Stephanie [Watters] in the bed, Stevie [Skaggs] on the chair and they shot them both. And [petitioner] said he shot Stevie in the head with a 9 mm and recovered his casing—hit his cuff on his pants.

Regarding the arson, Everett testified that "[a]ll [he] remember[s] is seeing a gas jug at [petitioner's] house and he ordered Charlie to go down and burn the evidence in the house." Everett testified further that petitioner "threatened me, my family and everything."

Delana Willis, who was married to petitioner from December 21, 2016, to January 17, 2019, but was petitioner's girlfriend at the time the crimes were committed, also testified for the State.[5] She testified that in late October and early November of 2016, the Gills frequented petitioner's home while she was staying there, and she overheard them discussing problems that the Gills and petitioner had with the victims. "Everett got mad because Stephanie [Watters]—she was doing things, showing her body and stuff for pills and money and she quit. So he got mad about it. And Stevie [Skaggs] had stole some tools from Charlie and Everett." Ms. Willis heard them reference the "clean air act," and she understood that to mean that the three men were going

---

[4] According to Mr. McCloskey, petitioner also admitted to him that he "help[ed] give advice as to how to clean up the—the evidence."

[5] Before Ms. Willis took the stand, petitioner informed the court that "[w]e need to go in the anteroom." The parties and counsel went to the anteroom, but, according to the trial transcript, "[d]ue to technical malfunction, there is no recording for the anteroom conversation."

to kill Mr. Skaggs and Ms. Watters. Ms. Willis further testified that petitioner had told her that he loaned Ms. Watters $1,500 to purchase methamphetamine, which Ms. Watters had not repaid.[6]

Ms. Willis recalled that, on the night of the murders, petitioner and Charles left petitioner's home at approximately 9:00 p.m. and returned at approximately 9:45 p.m. Although petitioner and Charles told Ms. Willis that they were going to kill Mr. Skaggs and Ms. Watters, Ms. Willis "didn't really believe it," but she observed Charles with "[a] 12gauge sawed-off shotgun" and petitioner with "[a] 9mm Ruger." The two returned home with those same guns, and when they returned home, Charles "bang[ed] on the door and was like, we just went down there and blew their face-off and—let us in." Petitioner told Ms. Willis that "he shot Stevie [Skaggs] twice after Charlie did," and he showed her "a slug that was like smashed up and he said that it went out of Stevie's head and hit his kneecap" before he picked it up. Ms. Willis testified that petitioner and Charles burned the clothes they were wearing at the time of the murders.

Ms. Willis also heard petitioner and Charles discuss burning the victims' residence: "They said they was going to go down there and burn them and the house down so that would get rid of the evidence with [an] oil and gasoline mixture." Ms. Willis observed the flames as the victims' residence was burning from petitioner's home, and "[b]efore we seen flames up in the sky [Charles] had came right back to our house . . . [a]nd said that's what he had done." Charles confirmed to petitioner that he "set them on fire" and "got rid of it—everything."

Ms. Willis further testified that she saw petitioner "rifle[] the barrel" of his Ruger "with a drill," and she limited that testimony to what occurred prior to their marriage.[7] Also limiting her testimony to conversations had prior to their marriage, she recounted that petitioner, in discussing the murders, said that the victims "got what they deserved." Ms. Willis testified that she married petitioner despite knowing what he had done because she "was afraid of him and knew that [she] was stuck there anyways." She explained that she was "stuck" because petitioner "was physically mean to me. And he told me that if I married him I can't testify against him."

The State attempted to call Ms. McGraw as a witness. Petitioner objected, and the court directed the parties to the courtroom anteroom for a discussion about her testimony. The trial transcript reflects that "[d]ue to a technical malfunction, there is no recording for the anteroom conversation," but Ms. McGraw "was not called as a witness."

The defense called no witnesses, and following the jury's deliberations, it returned guilty verdicts on each count charged in the indictment. Additionally, the jury made no recommendation of mercy for either of petitioner's first-degree murder convictions.

---

[6] Another witness, a friend of Ms. Watters's, likewise testified that Ms. Watters owed petitioner money for drugs.

[7] A firearm and tool mark examiner with the West Virginia State Police Forensic Laboratory confirmed that tool marks had been placed inside the barrel of a 9mm Ruger owned by and recovered from petitioner in an apparent effort to obliterate the rifling placed in the barrel during the manufacturing process.

Petitioner moved for a new trial. Of relevance to this appeal, petitioner argued that the court erred in failing to disqualify the Fayette County Prosecuting Attorney's Office due to the alleged conflict of interest presented by Prosecutor Ciliberti's prior representation of Ms. McGraw. The court denied petitioner's motion for a new trial, finding that his motion to disqualify the prosecuting attorney's office was not timely filed and was "a delay tactic," as it was filed the day before trial. The court also found that petitioner had not established that the State failed to meet its obligations under *Brady*, and, in any event, Ms. McGraw was not permitted to testify at trial, so any objection to her testimony was rendered moot.

The court proceeded to sentence petitioner to life imprisonment for the first-degree murder of Ms. Watters, to life imprisonment for the first-degree murder of Mr. Skaggs, to not less than one nor more than five years for his conspiracy conviction, and to a determinate term of twenty years for his first-degree arson conviction. The court ordered that these sentences be served consecutively. Petitioner now appeals.

In his first assignment of error, petitioner asserts that the circuit court erred in denying his motion to disqualify the Fayette County Prosecuting Attorney's Office. Petitioner argues that Prosecutor Ciliberti's ethical duty to Ms. McGraw to maintain confidentiality precluded him and his office from disclosing impeachment material under *Brady*. Petitioner argues that a conflict of interest existed, and he cites Rule 1.9(a) of the West Virginia Rules of Professional Conduct and cases interpreting that rule in support of his argument. Petitioner states further that a prosecutor has a duty to avoid even the appearance of a conflict of interest.

Petitioner's conjectural assertions regarding the existence of a conflict and Prosecutor Ciliberti's ability to comply with *Brady* are too indefinite to demonstrate that the circuit court abused its discretion in denying his motion to disqualify the prosecuting attorney's office. *See State v. Jessica Jane M.*, 226 W. Va. 242, 256, 700 S.E.2d 302, 316 (2010) ("This Court has . . . indicated that whether a trial court should disqualify a prosecutor, or his office, from prosecuting a criminal defendant is reviewed under an abuse of discretion standard."). Notably, Ms. McGraw did not testify at trial. Also, Rule 1.9(a) of the Rules of Professional Conduct, which addresses duties to former clients, does not fit the situation presented here. That rule states that "[a] lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing." *Id.* Petitioner does not explain how Prosecutor Ciliberti violated this rule, and from the Court's standpoint, he has not. Petitioner is not a former client of Prosecutor Ciliberti, so the prosecutor owed no duties to him as a former client, and the rule provides no basis for the circuit court to have disqualified the prosecutor and his office.

Furthermore, petitioner has not demonstrated any violation under *Brady* because "[a] *Brady* claim can not be premised upon speculation." *State v. Shanton*, No. 16-0266, 2017 WL 2555734, *4 (W. Va. June 13, 2017)(memorandum decision) (citation omitted). Petitioner asserts only that "confidential information" Ms. McGraw disclosed to Prosecutor Ciliberti would be "vital

6

to impeach Ms. McGraw"—a non-testifying witness[8]—and that Prosecutor Ciliberti "knew substantially more information and information of a confidential nature about Ms. McGraw and her involvements in this case or other crimes." To establish a due process violation under *Brady*, however, petitioner must show that "the evidence at issue [was] favorable to [him] as exculpatory or impeachment evidence," that the evidence was suppressed by the State, and that the evidence was "material, i.e., it must have prejudiced the defense at trial." Syl. Pt. 2, in part, *State v. Youngblood*, 221 W. Va. 20, 650 S.E.2d 119 (2007). Without having so much as identified what the "evidence" is, petitioner has not established a due process violation under *Brady*, and we decline to presume one. On the whole, petitioner's arguments are purely theoretical, and he has established neither a disqualifying conflict nor error in the court's denial of his motion.

In petitioner's second assignment of error, he claims that Ms. Willis's testimony was elicited in violation of the marital confidence privilege. Petitioner argues that communications between spouses are presumptively confidential, and it was incumbent upon the State to prove that their communications were not confidential, but the State "never offered to overcome the presumption." Petitioner also highlights that, due to a transcription malfunction, he is "unable to discern what arguments or proffers of counsel were made, or what limiting instructions were given as related to this objection made at side bar." Further, he argues that the incomplete trial transcript prevents this Court from fully considering petitioner's conviction and suggests that, because the transcript is incomplete, he is entitled to a new trial. *See* Syl. Pt. 2, *State ex rel. Kisner v. Fox*, 165 W. Va. 123, 267 S.E.2d 451 (1980) ("The failure of the State to provide a transcript of a criminal proceeding for the purpose of appeal, absent extraordinary dereliction on the part of the State, will not result in the release of the defendant; however, the defendant will have the option of appealing on the basis of a reconstructed record or of receiving a new trial.").

Preliminarily, we note that although this Court has held that "all proceedings in the criminal trial are required to be reported," we have further held that "the failure to report all of the proceedings may not in all instances constitute reversible error." Syl. Pt. 5, in part, *State v. Bolling*, 162 W. Va. 103, 246 S.E.2d 631 (1978). "[O]nly if the missing portion of the transcript specifically prejudices a defendant's appeal" is a new trial warranted. Syl. Pt. 8, in part, *State v. Graham*, 208 W. Va. 463, 541 S.E.2d 341 (2000). Ms. Willis's trial testimony is transcribed in full, so this Court's review of petitioner's claim regarding her testimony is not limited or impeded in any way. As a result, petitioner's appeal is not prejudiced by the technical malfunction, and he is not entitled to a new trial on this basis.

---

[8] Other courts have found that, where a witness does not testify, there is no obligation to disclose impeachment material. *See People v. Bryant*, 668 N.Y.S.2d 646, 648 (N.Y. App. Div. 1998) ("The Supreme Court properly determined that, since Alvarez did not testify at the trial, his credibility was not in issue, and therefore any promise of leniency he had received from the police in exchange for assisting in the investigation was not *Brady* material . . . ."); *United States v. Mayers*, No. CR16-0258-JCC, 2017 WL 823292, *2 (W.D. Wash. Mar. 2, 2017) ("[T]here is no authority that supports Defendant's claim that the Government must provide potential impeachment evidence for non-testifying witnesses."). So, for the additional reason that Ms. McGraw did not testify, petitioner's claim that the State was possibly unable to provide impeachment material under *Brady* is baseless.

The marital confidence privilege, codified at West Virginia Code § 57-3-4, provides that

> [n]either husband nor wife shall, without the consent of the other, be examined in any case as to any confidential communication made by one to the other while married, nor shall either be permitted, without such consent, to reveal in testimony after the marriage relation ceases any such communication made while the marriage existed.

The privilege, therefore, pertains to "confidential communication exchanged *during the marriage*." *State v. Richards*, 182 W. Va. 664, 668, 391 S.E.2d 354, 358 (1990) (emphasis added). Petitioner and Ms. Willis married on December 21, 2016—after the victims' murders. A review of Ms. Willis's trial testimony reveals that, to the extent she testified to confidential conversations with petitioner, those conversations occurred prior to and shortly after the victims' murders and, therefore, prior to her marriage to petitioner. In addition, Ms. Willis was instructed at least twice to limit her testimony of conversations had with petitioner to those had prior to their marriage. Not only does our review reveal no infringement upon the marital confidence privilege, but, indeed, petitioner fails to point this Court to a single statement made by Ms. Willis that he claims was in violation of the privilege, so he has not established error on this ground.

For the foregoing reasons, we affirm.

Affirmed.

**ISSUED:** May 26, 2022

**CONCURRED IN BY:**

Chief Justice John A. Hutchison
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice William R. Wooton

**NOT PARTICIPATING:**

Justice C. Haley Bunn