711 S.E.2d 607

**STATE of West Virginia, Plaintiff Below, Appellant**

**v.**

**David Wayne KAUFMAN, Defendant Below, Appellee.**

**No. 35691.**

Supreme Court of Appeals of West Virginia.

Submitted March 30, 2011.

Decided June 22, 2011.

---

**13.** The use of the singular and plural is interchangeable within the UCC. *See* W.Va.Code § 46–1–106(1) (2007).

**14.** *See supra* note 6.

McHUGH, J.:

This is an appeal by David W. Kaufman from his conviction of first degree murder in the Circuit Court of Wood County, West Virginia. Upon the jury's recommendation of a sentence of life without mercy, the trial court so sentenced Appellant by order entered March 23, 2009. On appeal, Appellant argues that the trial court improperly admitted into evidence the victim's diary and certain statements by the victim to others, both of which recounted alleged threats and acts of violence by Appellant towards the victim during the weeks preceding her death.

Upon careful consideration of the arguments of the parties and the applicable legal authority, and for the reasons discussed below, we reverse Appellant's conviction and sentence and remand this case for a new trial.

I. Factual and Procedural Background

In the early morning hours of December 18, 2007, Appellant's wife, Martha Kaufman, was found dead in the closet of her bedroom as the result of a gunshot wound to the left side of her head. A .22 caliber pistol was found in her left hand.[1] The medical examiner determined that the time of death was between noon and 4:00 p.m. the preceding day. At trial, Medical Examiner Dr. Zia Sabet testified that the manner of death was undetermined; in other words, Dr. Sabet was unable to determine if the victim died as a result of a homicide or suicide.

Police found the victim's body after the couples' children, Kristy and Zachary, notified them that they were unable to get in touch with their mother by telephone or locate her in the family home even though her car was parked there. It is undisputed that the victim suffered from depression and anxiety and rarely left the house.

When police arrived at the family's house in the early morning hours of December 18th, Appellant was there and invited the officers inside. Appellant told police that he had dropped off the victim at Wal Mart at 1:00 p.m., where she was to do some shopping and then meet Kristy at the nearby Toys R Us store where she worked. Accord-

Darrell V. McGraw, Jr. Esq., Attorney General, Benjamin F. Yancey, III, Assistant Attorney General, Charleston, WV, for Appellee.

George J. Cosenza, Parkersburg, WV, for Appellant.

---

1. The victim was right-handed.

ing to Appellant, the victim intended to get a ride home with Kristy after she finished her shift. Appellant told police that he arrived at the house at approximately 9:00 p.m., not long after Kristy arrived to look for her mother.[2]

The police searched the home and eventually found the victim's body in the closet of her bedroom.[3] After the body was found-but before they informed Appellant that they found it-the police questioned Appellant further about the Wal Mart story. When police advised him that Wal Mart surveillance video would have been able to record whether his wife safely made it into the store, Appellant admitted that the story had been fabricated. It was at that time that Appellant told police that his wife told him she had cancer[4]; that she was not going to undergo treatment; and that she was planning to kill herself on December 17th. According to Appellant, his wife had threatened suicide on prior occasions and thus, he was "skeptical" about her current plan to end her life. Appellant stated that she told him to tell the Wal Mart story to anyone who asked and also advised him that he should be sure to have an alibi.

When questioned further by police, Appellant stated that Zachary left the house for

work at approximately 12:30 p.m.[5] and, not long after that, Appellant also left the house to go to his mother's home to bake cookies.[6] Appellant maintains that when he left the house, his wife was still alive and was sitting in the recliner where she spent much of her time and where she often slept. At trial, a surveillance video of a local McDonald's showed Appellant going through the drive-thru at 12:59 p.m. Appellant's mother, Geneva Kaufman, testified that Appellant brought her lunch from McDonald's and that he arrived at her house sometime after 1:00. Appellant told police that when he returned home that night at 9:00 p.m., Kristy was there looking for her mother.[7]

At trial, there was virtually no physical evidence linking Appellant to the death of his wife. Although gunshot residue testing conducted on the victim was positive for gunshot residue on her left hand, testing conducted on Appellant's body, clothing and various other items taken from the home were negative.[8] Testing for blood identification on Appellant's clothing and the various other items taken from the home were negative for the presence of blood. Furthermore, neither Appellant's nor the victim's fingerprints were

2. Kristy was unaware of any plans by her mother to meet her at Toys R Us. Rather, Kristy had called her mother, as she routinely did, but her mother failed to return her message or to answer subsequent telephone calls. Because it was out of the ordinary for her not to be available by telephone, Kristy became concerned, contacted her brother and returned to the home to look for her. She and her brother eventually contacted police.

3. Appellant told police that when he learned from Kristy that her mother was missing, he searched all the bedrooms, including underneath the beds. However, he stated that he did not look in the closets.

4. According to Appellant, his wife urged him not to tell their children that she had cancer. Appellant told police that although he told several other people, he never personally verified whether she had it. At trial, both the medical examiner and the victim's physician testified that, in fact, the victim did not have cancer.

5. At the time of their mother's death, both children lived at home with their parents. Zachary was approximately twenty years old and Kristy, approximately twenty-four.

6. Zachary testified at trial that when he left for work at approximately 12:30 p.m., both of his parents were at home.

7. Contrary to what Appellant told police, his neighbor testified that, at approximately 5:30 that evening, Appellant walked past their home towards his own and that her young daughter waved to him and he waved back.

8. According to Michelle Cook, an employee of the West Virginia State Police Forensic Laboratory who conducted the gunshot residue testing in this case and who was recognized at trial as an expert in the field of gunshot residue analysis, one of Appellant's shirts tested for gunshot residue was found to have some particles consistent with gunshot residue, but which particles are also consistent with, for example, automotive sources like car batteries, spark plugs and brake pads. Appellant was known to work on cars. Ms. Cook testified that she could not positively determine that the particles found on Appellant's shirt were generated by the firing of a gun. The shirt on which the particles were found was one of several articles of clothing tested by police and was not the shirt Appellant was wearing when police arrived at his home.

found on either the gun or the ammunition magazine and there was no evidence that these items had been "wiped clean." Testing on scrapings taken from underneath the victim's fingernails revealed only her own DNA. Luminol testing was conducted on the closet where the victim's body was found in order to determine if blood or other trace evidence had been cleaned up. The results of this testing were negative.

A large part of the State's case against Appellant stemmed primarily from the dysfunctional nature of the marriage between Appellant and the victim. The testimony of the couples' children at trial revealed that Appellant and his wife, though living in the same house, had been estranged for more than ten years. The children testified that their parents lived separate lives and never did anything or went anywhere together. During the summer of 2007, Appellant began an affair with another woman and, as he told police, was contemplating divorce up until the time his wife told him she had cancer. In late October or early November of 2007, the victim attempted suicide by sitting in her car with the motor running and the garage door closed. Upon being found by her children, she told them not to tell Appellant. As indicated above, the victim did not often leave the house. Physically, the home was in disarray and disrepair. The victim suffered from depression and anxiety and although she was prescribed several medications to treat these illnesses, nine unfilled prescriptions were found in her purse during the police investigation.[9]

The State presented evidence at trial that Appellant and his wife had incurred considerable financial debt, which caused further stress on the marriage. Approximately several months before his wife's death, Appellant learned that his employer, NOVA Chemicals, would be closing in January 2008. The evidence revealed that there were two life insurance policies in place payable to the surviving spouse upon the death of either Appellant or his wife. The State argued that the proceeds of these policies would have gone a long way towards relieving the couples' debt. One of the policies had been taken out through Appellant's employer several years previously and, according to the State's theory at trial, Appellant killed his wife before NOVA's January 2008 closure in order to collect the proceeds from that life insurance policy.[10]

Though the couple's relationship was, by all accounts, dysfunctional, both Kristy and Zachary testified that they never witnessed any physical or verbal abuse by Appellant towards their mother during the course of their marriage. To the contrary, they testified that Appellant kept to himself when he was at home and that there was never much conversation among the family.[11] Zachary acknowledged that arguments between his parents were almost always instigated by his mother. Both children testified about one fight in particular in which their mother and Kristy yelled and cursed at Appellant for an hour primarily about his girlfriend.[12]

As discussed in more detail below, a large part of the State's case relied upon out-of-

9. The medical examiner testified that no alcohol or drugs (including her prescription medications for depression and anxiety) were found in the victim's system at the time of her death.

10. The State argued that Appellant believed he would not be entitled to the life insurance proceeds after the plant's closure. In reality, however, Appellant was eligible to retire when the plant closed and thus, his life insurance would have remained in effect.
 The evidence at trial revealed that the victim had not paid the premiums on the remaining life insurance policy for several months prior to her death. It is unclear from the record whether Appellant was aware of this fact or whether the policy would have paid out upon the death of either Appellant or his wife.

11. The children testified that although Appellant was very quiet at home, he was very talkative and jovial when out in public.

12. This argument occurred on November 12, 2007. It was during this argument that the victim forced Appellant to admit to the children that he was having an affair. Kristy testified that Appellant had no reaction to the yelling——"only silence." Both Kristy and Zachary testified that at the end of that fight, the family agreed that when Appellant's employer closed in January, they would all go their separate ways. Until then, their mother promised that she would try to keep their remaining time in the house "peaceful."

court statements made by the victim to her children and to her daughter's boyfriend, and upon a more than sixty page diary written by the victim ostensibly during the weeks preceding her death.

### Victim's statements to others

Over Appellant's hearsay objection, the State elicited testimony from Kristy, Zachary, and Kristy's boyfriend, Jimmy Schreckengoest, regarding certain statements the victim made to them of alleged threats and acts of violence by Appellant towards her during the weeks preceding her death. Kristy, Zachary and Jimmy all testified that in early December, the victim told them that Appellant threatened her with a gun. According to Kristy, she spoke with her mother the same evening the incident allegedly occurred. Kristy testified that during a routine telephone conversation,

> [her mother] sounded shaken up when she answered. She was being very quiet, not her normal self, and I asked her what was going on and she said nothing at first, and I said, 'I don't believe that. What's the matter?' And she told me that she needed to keep her outbursts to a minimum like she promised and I said, 'What do you mean?' And she said that after I'd left the house that evening, that the Defendant had come in and threatened her with a gun.

Kristy testified that she did not call the police or confront Appellant about the incident because her mother told her not to.

That same evening, following Kristy's telephone call with her mother, Jimmy drove Kristy to her parent's home so that she could gather some clothing to stay over at Jimmy's house. While he sat in his car outside the house waiting for Kristy, her mother walked out to speak to Jimmy. Jimmy testified that although the two had never before been introduced, she told him

that the reason she wanted Krist[y] to stay with me overnight was because [Appellant] and her had gotten into an altercation earlier in the day. She had been admittedly giving him a hard time about his girlfriend.

· · · · ·

And she said he was getting more and more angry with her as she kept on about it. She said at one point, he went upstairs and returned with a gun and had pushed her up against the wall and told her to keep her mouth shut or he would shut it for her.

In recounting the same incident to Zachary late at night on December 16th, the day before she died, his mother "mentioned that at one point, [Appellant] had held a gun to her head and said 'This can shoot through a pig skin.' Zachary testified that her demeanor "[f]or the first part of it, she seemed, you know, pretty okay. She was pretty calm about it. But after a while, I mean, you could tell it was starting to affect her a little bit when she was talking to me about it, so ... [.]".

Zachary and Jimmy also testified about another incident the victim recounted to them in which Appellant allegedly attempted to strangle her with a cord. Jimmy testified that during the previously-described conversation he had with the victim in early December, she told him that Appellant "had tried to strangle her with an object and she had to kick him to get away from him; and then after she'd gotten away, that things went back to normal[.]" When asked what type of "object" Appellant used, Jimmy testified that "[t]he word she used, I believe, was cord, but I don't—she didn't say anything really specific." [13] Jimmy further testified that the victim did not cry or yell when she recounted this incident, rather "[s]he just seemed irritated more than anything, like it was just something that bothered her. She wasn't really, I would say, upset or angry."

---

13. During the course of their investigation, police found an extension cord in Appellant's gun case. Based on statements by the victim in her diary, the cord was tested and was found to have the victim's DNA on the center of the cord. The State was unable to establish the source of the DNA. Appellant objected to the admission of evidence concerning the extension cord on the grounds that the State was unable to make any connection between the cord and the alleged strangling attempt and because the evidence was highly prejudicial. The trial court overruled Appellant's objection and admitted the extension cord into evidence.

Zachary also testified that on the Thanksgiving Day preceding his mother's death, she told him that she had wanted to cook Thanksgiving dinner for him but that Appellant would not let her. She also showed him several marks around her neck and claimed Appellant tried to strangle her. Zachary described the marks as "red, but they didn't look like they had just happened." Indeed, he testified that she did not indicate when the alleged strangulation had actually occurred. Zachary further testified that his mother cried as she showed him the marks around her neck.[14]

Although Appellant objected to the admission of the foregoing statements by the victim to Kristy, Zachary and Jimmy on hearsay grounds, the trial court stated that it would admit them pursuant to this Court's decision in State v. Sutphin, 195 W.Va. 551, 466 S.E.2d 402 (1995).

### Victim's diary

Over Appellant's hearsay objection, the State also introduced at trial the victim's diary. The diary was approximately sixty-three pages in length, with undated entries written by the victim purportedly during the weeks preceding her death. The diary was located in the victim's sock drawer and was found by Kristy and given to police. It was read into evidence by one of the investigating officers. Included in the victim's diary were statements she wrote describing the alleged incidents previously discussed and testified to by Kristy, Zachary and Jimmy.[15] Additionally, the victim wrote that Appellant was angry about her unsuccessful suicide attempt and that "he was crystal clear that he was disappointed that I did not 'get it right.'" About her prior suicide attempt, the victim wrote that

[a]nyone who knows me well knows how I feel about suicide. I've been the one left behind to pick up the pieces & go on[16] & I would NEVER put my kids through that. I think I was just trying to get the message across to my family that the whole situation with [Appellant] & his girlfriend .... all this stuff is just too much to handle. So I popped a few Xanax, put the car window down, started the engine & just laid down & went to sleep. I really did not want to die. I just wanted/needed all of this to stop before my entire family falls apart. When the kids woke me up in the car[17] & realized what I attempted to

14. During Zachary's conversation with his mother on December 16th, she told him that she and Appellant had argued earlier that day. Zachary testified that she did not provide any details about the argument but that there was no indication that it was physical in nature.

15. With regard to the alleged incident involving the gun, the victim described in her diary that she had "crossed the line" when she told Appellant she was going to go to his girlfriend's house to talk to her and to the school of the girlfriend's son to "tell him everything that I want to say to his mom." According to the diary, Appellant went upstairs and

came back down & started waving a dark colored pistol at me.... The next thing I know, I'm up against the wall with that gun in my face. He had me pinned by the neck & said if I ever called or went near either the girlfriend or her son—he'd use it on me. I started to feel faint again & he punched me, then grabbed my neck again. He was screaming in my face like a madman 'do you understand? do you understand?' I was crying & nodded yes & after a minute he let me go.
She further wrote that when she wished Appellant happy birthday, "[h]e decided he'd rather talk about that damn gun. He said it was powerful enough to 'kill a pig.' When I asked what that meant he said these are used to go through

thick skin & very hard skulls. Wow! I wasn't expecting that."
Concerning the alleged strangling incident, the victim wrote in her diary that Appellant told her to "fake sick" and not make Thanksgiving dinner for Zachary. "When I refused, I found myself with an extension cord around my neck, being pulled so tightly that I thought I was going to die right then. Eventually, it came off." We note that, according to Jimmy's testimony, the victim told him that when Appellant tried to strangle her, "she had to kick him to get away; and then after she'd gotten away, that things went back to normal[.]" The victim did not indicate in her diary that she had to kick Appellant to get away from him; rather, she wrote only that "[e]ventually it [ie, the cord] came off."

16. The victim's first husband committed suicide by a self-inflicted gunshot wound.

17. Kristy's testimony regarding her mother's suicide attempt differed from the victim's account in her diary. Kristy testified that when she opened the garage door, her mother's car was running and she had a "cigarette lit, it was obvious she'd been crying, she was upset and I was worried that she was trying to do something to herself." Contrary to her mother's statement in her journal that she fell asleep after taking

do, their reactions made it 100% clear to me that I need to live. I need & want to be around for my kid's no matter what. [Appellant's] reaction to my attempt was painful to me but it was nothing in comparison to seeing the devastation to my kids that I'd caused, just for my own selfish attempt to get my family's attention. I will NEVER do any thing so foolish & selfish again. It's clear that my kids love & need me & my only goal in life now is to ALWAYS put them first—regardless of my own pain. I love them more than anything in this world. They are my '2 perfect works of art.' MORE LATER"

(Footnotes added)

According to the victim's diary, she and Appellant argued about "the same old thing that he's been telling me a lot-which is that I'm worth more to him dead—than alive." The victim also wrote that "[t]onight he said 'you just won't f* * * * * * die' " and

'you should have been dead a long time ago'. . . . Nova is going to close soon—and my life insurance there is $100,000.00. What worries me is that the insurance is only active while he is employed there. I hope I'm just being paranoid—but sometimes I think he'd prefer my death to me living. He's made that pretty clear.

The victim further recounted a discussion with Appellant which began about finances and

quickly escalated to how all problems would be solved if I would 'just die.' He believes that the insurance would keep him

going and my death would allow his total freedom. . . . . He asked me twice in this 'discussion' to kill myself and 'do it right this time .' He even offered to help me!!. . . . I was so frustrated that I said why don't you just kill me & get it over with. He said 'don't think I haven't thought about it.' He claims that he's researched how to beat a lie-detector test, how to make a murder look like a suicide and how to fool the cops around here because none of them are qualified to go up against someone like him. I told him that they would take his computer and see what he'd been 'researching.' His reply was that he's not that stupid & that there are many computers he could use besides his own [18]. . . . Well, I'm NOT going to kill myself—if he wants that—he's going to have to do it himself or get someone else to do it. If I die—my blood will be on his hands—not mine. He also says that he found out how to get gunpowder on my hands without me pulling the trigger.

(Footnote added)

In addition to the foregoing, the victim's diary also included countless entries about random events and thoughts. Many of the entries portray Appellant in a very unfavorable light, while others portray the victim in a very favorable one. By way of example only, the victim wrote that she loves and respects Appellant's mother [19]; that Appellant spent the money due on their homeowner's insurance on his girlfriend [20]; that because of Appellant, Kristy never wants to get married [21]; that she is proud to be her children's

Xanax and the children woke her up, Kristy stated that her mother was alert when she found her.

**18.** Based upon this statement in the victim's diary, investigators conducted a search of the computers from Appellant's home and work, as well as the computer belonging to his girlfriend. No incriminating evidence was found.

**19.** The victim wrote: "I really love Geneva. Most people complain about their mother-in-law, but I have nothing but respect & love for mine. She'd hate the condition of our house, though, I am on a cleaning strike & have been for months."

**20.** The victim wrote: "I got a call from Gina at Nationwide regarding our homeowners insur-

ance. I was under the assumption that it had been paid for 6 months, I know he had the $700.00 to pay it but it never got paid ... It appears that our 'bill money' is being spent in Marietta [referring to where the girlfriend resides] (found the receipt where he bought her clothes) and on their trips to the mountains. They've taken 2 so far . . . . that I know of. OH WELL."

**21.** About her daughter, the victim wrote that Kristy "told me a few nights ago that her dad has 'single handedly made sure that marriage is totally out of the question.' She says that it is impossible to commit to the idea, knowing all that she does about him. I told her that it is unfair to judge other men by her dad. She needs love & often feels that I'm the only one capable of loving her."

mother [22]; and that she avoided Appellant on his birthday.[23]

Additionally, the victim wrote about incidents considered by the trial court to be "routine daily things occurring in [her] life" which the State went to great lengths to corroborate with evidence presented during

several hearings in this case.[24]  It was based upon entries of this nature and their corroboration by the State that the trial court ruled the entire sixty-three page diary to be trustworthy [25] and, therefore, admissible,[26] primarily under the residual hearsay exception, West Virginia Rule of Evidence 803(24),[27]

**22.** Concerning her children, the victim wrote:

> I could write volumes of how proud I am of both of them.  They are without a doubt my 2 great accomplishments in this life.  I've stayed in this marriage for 23 years—for them.  I've always believed that if they had both parents under the same roof—raising them—they would have security & stability in their lives and would grow up to be upstanding adults.  I was right.  . . . .  I want to be around for a long, long time—just to let them know how wonderful they are & to let the world know that these 2 incredible human beings are MY CHILDREN.
>
> The sad part of the story is that when we reminisce about happy times & all the funny things that have happened over the years— their Dad is not involved in any of it.  I just hope I've done a good enough job at being their mom & their dad that they have more happy memories than sad ones.

**23.** In her diary, the victim wrote that

> Tomorrow is [Appellant's] birthday—I hope he doesn't do anything memorable.  His first birthday after Zach was born—he got a vasectomy!  What a way to make a statement, huh?  Zach was only 2 months old & he made a point of scheduling the vasectomy on his birthday.  I hope doesn't [sic] have another statement to make on tomorrow's birthday.  We'll see I guess.  Just in case, I'm going to leave before he gets up & not come back until he leaves for work.  Things have certainly come full circle.  I used to buy him gifts, make special dinners & bake cakes for his birthday.  No, I'm feeling the need to avoid him on his birthday—just for myw own safety.  More later.

**24.** For example, at various times in her diary, the victim wrote that she was pulled over by a police officer for running a stop sign; that her son was having girlfriend trouble; that her favorite NFL football team defeated another team; and that her mother-in-law's friend had passed away. The State presented evidence to corroborate the victim's diary statements about these events in an effort to show that her entire diary was trustworthy.

**25.** The trial court relied heavily on the case of *Parle v. Runnels*, 387 F.3d 1030 (9th Cir.2004), in which the Ninth Circuit Court of Appeals determined that certain entries from the victim's diary were properly admitted at the defendant's first degree murder trial.  In reversing the federal district court's order granting the defendant's petition for writ of habeas corpus, the court in

*Parle* concluded the diary was nontestimonial in nature and its admission into evidence did not violate the defendant's constitutional rights under the Confrontation Clause.  387 F.3d at 1037.  The diary was admitted pursuant to an exception to the hearsay rule specific to California law.  The *Parle* court, *inter alia*, determined that it was not unreasonable for the state court to have found that the victim's diary was trustworthy because she kept it regularly and recorded in it everyday experiences of her life.  The court further found the diary to have a "particularized guarantee of trustworthiness."  387 F.3d at 1041.

**26.** A few brief portions of the diary were redacted before being admitted into evidence.  It was explained during oral argument before this Court that the redacted portions involved other allegedly criminal acts by Appellant not relevant to the case *sub judice*.

**27.** W.Va. R. Evid. 803(24) provides:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> . . . .
>
> (24) Other exceptions.—A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact;  (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.  However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.
>
> We note that W.Va. R. Evid. 803 provides for hearsay exceptions "even though the declarant is available as a witness" while Rule 804 provides for hearsay exceptions where the declarant is unavailable as a witness.  " 'Unavailability as a witness' includes situations in which the declarant—. . . . (4) is unable to be present or to testify

and "to a lesser degree," under W.Va. R. Evid. 803(3),[28] the hearsay exception for "then existing mental, emotional or physical condition."

Appellant was convicted of first degree murder and sentenced to life in prison without the possibility of parole. Appellant now appeals his conviction and sentence.

## II. Standard of Review

■ It is well settled that a trial court's rulings on the admissibility of evidence, "including those affecting constitutional rights, are reviewed under an abuse of discretion standard." *State v. Marple*, 197 W.Va. 47, 51, 475 S.E.2d 47, 51 (1996). In syllabus point one of *State v. Shrewsbury*, 213 W.Va. 327, 329, 582 S.E.2d 774, 776 (2003), this Court explained: " ' "Rulings on the admissibility of evidence are largely within a trial court's sound discretion and should not be disturbed unless there has been an abuse of discretion." *State v. Louk*, 171 W.Va. 639, [643,] 301 S.E.2d 596, 599 (1983).' Syl. Pt. 2, *State v. Peyatt*, 173 W.Va. 317, 315 S.E.2d 574 (1983)." *Accord* Syl. pt. 4, *State v. Rodoussakis*, 204 W.Va. 58, 61, 511 S.E.2d 469, 472 (1998) ("A trial court's evidentiary rulings, as well as its application of the Rules of Evidence, are subject to review under an abuse of discretion standard.").

## III. Discussion

We first address the trial court's ruling which admitted into evidence the victim's undated sixty-three page diary. Appellant argues that the diary was testimonial in nature and, as such, its admission into evidence violated his right to confront the witnesses against him, pursuant to *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), and *State v. Mechling*, 219 W.Va. 366, 633 S.E.2d 311 (2006). As

discussed in more detail below, we do not agree with Appellant's contention that the diary was testimonial; however, we do find that the trial court improperly admitted the sixty-three page diary into evidence and, based thereon, we reverse Appellant's conviction and sentence and remand for a new trial.

### A.

■ Under the Sixth Amendment to the United States Constitution and Section 14 of Article III of the West Virginia Constitution, an accused is guaranteed the right to confront and cross-examine the witnesses against him. As this Court held in syllabus point one of *State v. James Edward S.*,

The Confrontation Clause contained in the Sixth Amendment to the United States Constitution provides: 'In all criminal prosecutions, the accused shall ... be confronted with the witnesses against him.' This clause was made applicable to the states through the Fourteenth Amendment to the United States Constitution.

184 W.Va. 408, 409, 400 S.E.2d 843, 844 (1990), *overruled on other grounds by, State v. Mechling*, 219 W.Va. 366, 633 S.E.2d 311 (2006). *See* Syl. Pt. 3, *State v. Martisko*, 211 W.Va. 387, 388, 566 S.E.2d 274, 275 (2002). " 'An essential purpose of the Confrontation Clause is to ensure an opportunity for cross-examination. In exercising this right, an accused may cross-examine a witness to reveal possible biases, prejudices or motives.' " Syl. Pt. 2, in part, *State v. Phillips*, 194 W.Va. 569, 572, 461 S.E.2d 75, 78 (1995) (*quoting* Syl. Pt. 1, in part, *State v. Mason*, 194 W.Va. 221, 460 S.E.2d 36 (1995), *overruled on other grounds by, State v. Mechling*, 219 W.Va. 366, 633 S.E.2d 311 (2006).).

. . . .

at the hearing because of *death* or then existing physical or mental illness or infirmity[.]" W.Va. R. Evid. 804(a)(4) (emphasis added). Aside from the availability/unavailability distinction, Rules 803(24) and 804(b)(5) are virtually identical. As indicated above, the trial court admitted the victim's diary under Rule 803(24).

**28.** W.Va. R. Evid. 803(3) provides:
   The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

(3) Then Existing Mental, Emotional, or Physical Condition.—A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

■ In *State v. Mechling,* 219 W.Va. 366, 633 S.E.2d 311 (2006), this Court explained that in the United States Supreme Court case of *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), *abrogated on other grounds by Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), "the Confrontation Clause allowed the out-of-court statement of a witness to be admitted against an accused if it was shown that the witness was unavailable for trial, and that the witness's statement bore 'adequate "indicia of reliability." ' " *Mechling,* 219 W.Va. at 371, 633 S.E.2d at 316. In *Mechling,* we discussed a trilogy of cases decided by this Court in which we interpreted and applied *Roberts.* First, in syllabus point two of *James Edward S.,* we held that

> The two central requirements for admission of extrajudicial testimony under the Confrontation Clause contained in the Sixth Amendment to the United States Constitution are: (1) demonstrating the unavailability of the witness to testify; and (2) proving reliability of the witness's out-of-court statement.

184 W.Va. at 410, 400 S.E.2d at 845. *See Mechling,* at syl. pt. 3, 219 W.Va. at 368, 633 S.E.2d at 313.

■ After our decision in *James Edward S.,* we considered the case of *State v. Mason,* 194 W.Va. 221, 460 S.E.2d 36 (1995), *overruled on other grounds by, State v. Mechling,* 219 W.Va. 366, 633 S.E.2d 311 (2006). In *Mason,* we expanded our holding regarding the reliability of a witness's out-of-court statement and concluded that there need be no independent assessment of the statement if it was admissible under a firmly-rooted hearsay exception. *See Mechling,* 219 W.Va. at 372, 633 S.E.2d at 317. As we held in syllabus point six of *Mason,*

> For purposes of the Confrontation Clause found in the Sixth Amendment to the United States Constitution and Section 14 of Article III of the West Virginia Constitution, no independent inquiry into reliability is required when the evidence falls within a firmly rooted hearsay exception.

194 W.Va. at 224, 460 S.E.2d at 39. *See Mechling* at syl. pt. 4, 219 W.Va. at 368, 633 S.E.2d at 318.

■ The third case we discussed in *Mechling* was *State v. Kennedy,* 205 W.Va. 224, 517 S.E.2d 457 (1999), *overruled on other grounds by, State v. Mechling,* 219 W.Va. 366, 633 S.E.2d 311 (2006), in which we concluded that "the Confrontation Clause test espoused in *Roberts* applied only to out-of-court statements made by a witness in a prior judicial proceeding." *Mechling,* 219 W.Va. at 372, 633 S.E.2d at 317. We thus held in syllabus point 2 of *Kennedy* that

> We modify our holding in *James Edward S.,* 184 W.Va. 408, 400 S.E.2d 843 (1990), to comply with the United States Supreme Court's subsequent pronouncements regarding the application of its decision in *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), to hold that the unavailability prong of the Confrontation Clause inquiry required by syllabus point one of *James Edward S.* is only invoked when the challenged extrajudicial statements were made in a prior judicial proceeding.

205 W.Va. at 226, 517 S.E.2d at 459. *See Mechling,* at syl. pt. 5, 219 W.Va. at 368, 633 S.E.2d at 313.

Ultimately, our task in *Mechling* was to address the United States Supreme Court's decision in *Crawford,* which was decided after *Roberts* and after this Court's decisions in *James Edward S., Mason* and *Kennedy.*

We recognized in *Mechling* that, pursuant to *Crawford,* "testimonial" out-of-court statements are barred from admission under the Confrontation Clause: " 'Testimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine.' " *Mechling,* 219 W.Va. at 372, 633 S.E.2d at 317 (*quoting Crawford,* 541 U.S. at 59, 124 S.Ct. 1354). "The Confrontation Clause is a rule of procedure, not a rule of evidence. 'If there is one theme that emerges from *Crawford,* it is that the Confrontation Clause confers a powerful and fundamental right that is no longer subsumed by the evidentiary rules governing the admission of hearsay statements.' " *Id. (quoting*

*United States v. Cromer,* 389 F.3d 662, 679 (6th Cir.2004).).

In *Mechling,* we further recognized that the *Crawford* Court overruled *Roberts* because *Roberts* erroneously "allowed a jury to hear evidence that was untested by the adversarial process, and admission of the evidence was based on a mere judicial determination of reliability, a determination usually made under the rules of hearsay." *Id.,* 219 W.Va. at 372–78, 633 S.E.2d at 317–18 (citation omitted). Following *Crawford* then, this Court held in syllabus point 6 of *Mechling* that

> Pursuant to *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the Confrontation Clause contained within the Sixth Amendment to the *United States Constitution* and Section 14 of Article III of the *West Virginia Constitution* bars the admission of a testimonial statement by a witness who does not appear at trial, unless the witness is unavailable to testify and the accused had a prior opportunity to cross-examine the witness.

219 W.Va. at 368, 633 S.E.2d at 313.

Thus, we also overruled our decisions in *James Edward S., Mason* and *Kennedy* to the extent they relied upon *Roberts* and permitted the admission of a testimonial statement by an unavailable witness regardless of whether the criminal defendant had a prior opportunity to cross-examine. Accordingly, we held in syllabus point 7 of *Mechling* that

> To the extent that *State v. James Edward S.,* 184 W.Va. 408, 400 S.E.2d 843 (1990), *State v. Mason,* 194 W.Va. 221, 460 S.E.2d 36 (1995), and *State v. Kennedy,* 205 W.Va. 224, 517 S.E.2d 457 (1999), rely upon *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980) (*overruled by Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004)) and permit the admission of a testimonial statement by a witness who does not appear at trial, regardless of the witness's unavailability for trial and regardless of whether the accused had a prior opportunity to cross-examine the witness, those cases are overruled.

219 W.Va. at 368, 633 S.E.2d at 313.

Under *Crawford* and this Court's decision in *Mechling,* "only 'testimonial state-ments' cause the declarant to be a 'witness' subject to the constraints of the Confrontation Clause. *Non-testimonial statements by an unavailable declarant, on the other hand, are not precluded from use by the Confrontation Clause.*" *Mechling,* 219 W.Va. at 373, 633 S.E.2d at 318 (emphasis added). *See State v. Jessica Jane M.,* 226 W.Va. 242, 250, 700 S.E.2d 302, 310 (2010). In an effort to establish some parameters for what would constitute a "testimonial" out-of-court statement, this Court looked to the United States Supreme Court's post-*Crawford* decision in *Davis v. Washington,* 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), for additional guidance. In syllabus points eight and nine of *Mechling,* we concluded the following:

> Under the Confrontation Clause contained within the Sixth Amendment to the *United States Constitution* and Section 14 of Article III of the *West Virginia Constitution,* a testimonial statement is, generally, a statement that is made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

> Under the Confrontation Clause contained within the Sixth Amendment to the *United States Constitution* and Section 14 of Article III of the *West Virginia Constitution,* a witness's statement taken by a law enforcement officer in the course of an interrogation is testimonial when the circumstances objectively indicate that there is no ongoing emergency, and that the primary purpose of the witness's statement is to establish or prove past events potentially relevant to later criminal prosecution. A witness's statement taken by a law enforcement officer in the course of an interrogation is non-testimonial when made under circumstances objectively indicating that the primary purpose of the statement is to enable police assistance to meet an ongoing emergency.

219 W.Va. at 368–69, 633 S.E.2d at 313–14.

In the case *sub judice,* Appellant maintains that although the victim's diary does not neatly fit into the foregoing param-

eters set forth in *Mechling*, the diary, nevertheless, was testimonial for Confrontation Clause purposes. Appellant argues that during the time the diary was written, the couple's marriage was severely strained and Appellant had contemplated divorce. The victim was angry with him for having an extramarital affair and Appellant maintains she fabricated statements in her diary for the purpose of portraying Appellant in a bad light at his murder trial following her death by suicide. According to Appellant, *Mechling* does not provide an exhaustive list of all conceivable statements which are "testimonial" in nature [29] and thus, the victim's diary should be so classified and ruled inadmissible under the Confrontation Clause. Appellant's argument, while creative, is speculative at best. First, the statements in the diary were clearly not made to a law enforcement officer in the course of an interrogation. Furthermore, the circumstances surrounding the making of the statements do not objectively indicate that there is no ongoing emergency [30], and that the primary purpose of the victim's diary was to establish or prove past events potentially relevant to later criminal prosecution. *Id.*, at syl. pt. 9. Appellant's arguments notwithstanding, this Court is not persuaded that the victim's diary was made under circumstances which would have led her reasonably to believe that the diary would be available for use at a later trial date. *Mechling*, at syl. pt. 8. Therefore, we conclude that the victim's diary was nontestimonial for purposes of Confrontation Clause analysis and that, accordingly, the trial court committed no error on this issue.

### B.

▆▆▆▆ Unlike testimonial out-of-court statements, *nontestimonial* statements may be admissible in a criminal trial if it is shown that the witness was unavailable for trial, and that the witness's statement bore adequate indicia of reliability. *See Mechling*, 219 W.Va. at 371, 633 S.E.2d at 316.[31] In syllabus point five of *James Edward S.*, we held that

[e]ven though the unavailability requirement has been met, the Confrontation

---

**29.** In *Davis*, the United States Supreme Court acknowledged "it could not produce an 'exhaustive classification of all conceivable statements' that were either testimonial or non-testimonial." *Mechling*, 219 W.Va. at 374, 633 S.E.2d at 319. This Court in *Mechling* ultimately crafted its own "practical rules"—as set forth in, *inter alia*, syllabus points eight and nine, above—from what it described as the *Davis* Court's "diffuse guidelines" caused by that Court's "circumlocution." *Id.* (internal citations omitted).

**30.** The phrase " 'ongoing emergency' means just that, and once a government officer has gained the information 'needed to address the exigency of the moment' and 'the emergency appears to have ended,' then any further questioning by the government officer is more likely to elicit testimonial statements from the witness." *Mechling*, 219 W.Va. at 376, 633 S.E.2d at 321 (internal citation omitted).

**31.** As indicated above, this Court stated in *Mechling* that under *Crawford*, "only 'testimonial statements' cause the declarant to be a 'witness' subject to the constraints of the Confrontation Clause. Non-testimonial statements by an unavailable declarant, on the other hand, are not precluded from use by the Confrontation Clause." 219 W.Va. at 373, 633 S.E.2d at 318. Indeed, because *Crawford* addressed only the admissibility of testimonial statements, many courts have since held that the admissibility require-

ments set forth in *Roberts* continue to apply with regard to *nontestimonial* statements. *See United States v. Gibson*, 409 F.3d 325, 338 (6th Cir. 2005) ("*Crawford* dealt only with testimonial statements and did not disturb the rule that nontestimonial statements are constitutionally admissible if they bear independent guarantees of trustworthiness."); *United States v. Holmes*, 406 F.3d 337, 348 (5th Cir.), *cert. denied*, 546 U.S. 871, 126 S.Ct. 375, 163 L.Ed.2d 163 (2005) ("With respect to nontestimonial statements, however, *Crawford* leaves in place the *Roberts* approach to determining admissibility."); *United States v. Hendricks*, 395 F.3d 173, 179 (3rd Cir. 2005), *cert. denied*, —— U.S. ——, 129 S.Ct. 966, 173 L.Ed.2d 157 (2009) ("'[U]nless a particular hearsay statement qualifies as 'testimonial,' *Crawford* is inapplicable and *Roberts* still controls."); *Horton v. Allen*, 370 F.3d 75, 84 (1st Cir.2004), *cert. denied*, 543 U.S. 1093, 125 S.Ct. 971, 160 L.Ed.2d 905 (2005) ("'[U]nless [the witness's hearsay statements] qualify as 'testimonial,' *Crawford* is inapplicable and *Roberts* continues to apply."); *Compan v. People*, 121 P.3d 876, 881 (Colo.2005) ("The United States Supreme Court clearly stated in *Crawford* that its holding applied only to testimonial evidence; *Roberts* continues to govern federal constitutional scrutiny of nontestimonial evidence[.]"); *State v. Rivera*, 268 Conn. 351, 844 A.2d 191, 201 (2004) ("'[N]ontestimonial hearsay statements may still be admitted as evidence against an accused in a criminal trial if it satisfies both prongs of the *Roberts* test[.]")

Clause contained in the Sixth Amendment to the United States Constitution mandates the exclusion of evidence that does not bear adequate indicia of reliability. Reliability can usually be inferred where the evidence falls within a firmly rooted hearsay exception.

■ However, where such statements are not offered under a hearsay exception considered to be "firmly-rooted," then the statements are presumptively unreliable and must be excluded "at least absent a showing of particularized guarantees of trustworthiness.'" *James Edward S.*, 184 W.Va. at 414, 400 S.E.2d at 849 (internal quotations omitted).

In the case before us, the admissibility requirement that the declarant be unavailable for cross-examination at trial is clearly satisfied: the declarant of the sixty-three page diary at issue is the victim. Infinitely more problematic, however, is the task of determining whether the trial court properly concluded that the diary fell within either or both W.Va. R. Evid. 803(3), the state of mind hearsay exception, and W.Va.R.Evid. 803(24), known as the residual hearsay exception. In admitting virtually the entire diary into evidence,[32] the trial court, for all intents and purposes, treated the sixty-three page narrative as one statement. Thus, it is immeasurably difficult, if not impossible, to review the trial court's evidentiary ruling on appeal.

■ It is well settled that

'Generally, out-of-court statements made by someone other than the declarant while testifying are not admissible unless: 1) the statement is not being offered for the truth of the matter asserted, but for some other purpose such as motive, intent, state-of-mind, identification or reasonableness of the party's action; 2) the statement is not hearsay under the rules; or 3) the statement is hearsay but falls within an exception provided for in the rules.' Syl. Pt. 1, *State v. Maynard*, 183 W.Va. 1, 393 S.E.2d 221 (1990).

Syl. Pt. 3, *State v. Morris*, 227 W.Va. 76, 78, 705 S.E.2d 583, 585 (2010). As we have recounted in this opinion—though we have recounted only a sampling of the admitted narrative—the victim's lengthy diary has many components. Several statements written in the diary are potentially non-hearsay. Additionally, it is clear that there are several statements that Appellant threatened the victim or committed physical abuse towards her, while other entries may be characterized as statements of her state of mind, emotion and physical condition. Still, the victim wrote other statements of memory or belief about past events. The diary also consists of statements of the victim's thoughts, feelings, and observations not only about Appellant but about her children and others.

In *State v. Mason, supra,* this Court determined that W.Va. R. Evid. 804(b)(3), the statement against interest hearsay exception, does not allow for the admissibility of self-*exculpatory* statements even if they are made within a broader narrative that is generally self-*inculpatory.* We explained in *Mason* that

Using the broad definition of 'statement' articulated in Rule 801(a)(1)—'an oral or written assertion'—as a point of departure, .... the [United States] Supreme Court concluded that the word 'statement' means " 'a single declaration or remark,' " rather than " 'a report or narrative,' " reasoning that this 'narrower reading' is consistent with the principles underlying the rule. [*Williamson v. United States,*] 512 U.S. [594, 599], 114 S.Ct. [2431][,] 2434–35, 129 L.Ed.2d [476][,] 482 [ (1994) ], *quoting Webster's Third New International Dictionary* 2229, defn. 2(a) and (b) (1961). *Thus, when ruling upon the admission of a narrative under this rule, a trial court must break down the narrative and determine the separate admissibility of each ' "single declaration or remark.' "* This exercise is a 'fact-intensive inquiry' that requires 'careful examination of all the circumstances surrounding the criminal activity in-

---

**32.** As previously noted, a few brief entries were redacted before being admitted into evidence because they involved other allegedly criminal acts by Appellant deemed not to be relevant to the present case. Even with these redactions, the length of the victim's diary was admitted at trial was approximately sixty-three pages in length.

volved[.]' 512 U.S. at [604], 114 S.Ct. at 2437, 129 L.Ed.2d at 486.

194 W.Va. at 230, 460 S.E.2d at 45 (emphasis added). *See* Syl. Pt. 2, *In re: Anthony Ray Mc.*, 200 W.Va. 312, 315, 489 S.E.2d 289, 292 (1997); *Phillips*, 194 W.Va. at 585, 461 S.E.2d at 91. Although *Mason* and the United States Supreme Court case of *Williamson* specifically involved Rule 804(b)(3), the Sixth Circuit Court of Appeals in *United States v. Canan* subsequently concluded that the definition of the term "statement" in Rule 801(a) also extends to the other hearsay exceptions. 48 F.3d 954, 960 (6th Cir.1995). In *Canan*, the court stated that

> the term 'statement' must mean 'a single declaration or remark' for purposes of all of the hearsay rules. This determination is consistent with the idea implicit in Rule 801(a): that there is an overarching and uniform definition of 'statement' applicable under all of the hearsay rules. Rule 801(a) indicates that its definition of statement covers Article VIII (Hearsay) of the Federal Rules of Evidence, entirely.[33] It would make little sense for the same defined term to have disparate meanings throughout the various subdivisions of the hearsay rules.

*Id.* (Footnote added) The court in *Canan* thus found that the term "statement" means "a single declaration or remark" for purposes of Rule 804(b)(5) of the Federal Rules of Evidence (the residual hearsay exception). When ruling upon the admissibility of a narrative under that rule, the *Canan* court concluded that a court "must examine it sentence by sentence and rule upon the admissibility of each 'single declaration or remark.'" *Id.* According to the court in *Canan*, the appropriate inquiry is whether each 'single declaration or remark' meets the requirements set forth in Rule 804(b)(5). *Id.*

We find this approach to be well advised, keeping in mind that, additionally, the trial court must determine whether the evidence satisfies the relevancy requirements of W.Va. R. Evid. 401[34] and 402,[35] and if it does, whether, under Rule 403,[36] the evidence may nevertheless be excluded when the danger of unfair prejudice outweighs its probative value. *See State v. Satterfield*, 193 W.Va. 503, 512, 457 S.E.2d 440, 449 (1995). *See also* Syl. Pt. 10, *TXO Production Corp. v. Alliance Resources Corp.* 187 W.Va. 457, 460, 419 S.E.2d 870, 873 (1992) ("'Rules 402 and 403 of the *West Virginia Rules of Evidence* [1985] direct the trial judge to admit relevant evidence, but to exclude evidence whose probative value is substantially outweighed by the danger of unfair prejudice.' Syl. Pt. 4, *Gable v. The Kroger Co.*, 186 W.Va. 62, 410 S.E.2d 701 (1991).")

Accordingly, we hold that when ruling upon the admission of a narrative under Article VIII (Hearsay) of the West Virginia Rules of Evidence, a trial court must break down the narrative and determine the separate admissibility of each single declaration or remark.[37] The trial court must also ana-

---

**33.** This Court has stated that "[t]he West Virginia Rules of Evidence are patterned upon the Federal Rules of Evidence, ... and we have repeatedly recognized that when codified procedural rules or rules of evidence of West Virginia are patterned after the corresponding federal rules, federal decisions interpreting those rules are persuasive guides in the interpretation of our rules." (citations omitted). *State v. Sutphin*, 195 W.Va. 551, 563, 466 S.E.2d 402, 414 (1995).

**34.** W.Va. R. Evid. 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

**35.** W.Va. R.Evid. 402 provides that "[a]ll relevant evidence is admissible, except as otherwise provided by the Constitution of the United States,

by the Constitution of the State of West Virginia, by these rules, or by other rules adopted by the Supreme Court of Appeals. Evidence which is not relevant is not admissible."

**36.** W.Va. R. Evid. 403 states that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

**37.** Thus, a trial court must determine if the offered declaration or remark made by the unavailable declarant is hearsay and, if it is, whether it falls within a firmly rooted hearsay exception or has a particularized guarantee of trustworthiness. *See* Discussion, *supra*, and 2 Franklin D. Cleckley, *Handbook on Evidence for West Virginia Lawyers* §§ 8–3 and 8–7 (2000).

lyze whether the declaration or remark is relevant pursuant to W.Va. R. Evid. 401 and, if so, admissible pursuant to W.Va. R. Evid. 402. However, if the probative value of the declaration or remark is substantially outweighed by the danger of unfair prejudice, then it may be excluded pursuant to W.Va. R. Evid. 403. While we recognize this process may be fact intensive, we believe it to be critical to ensuring that unfairly prejudicial evidence is excluded from jury consideration and to ensuring that a criminal defendant is thus afforded a fair trial.

■ The trial court's admission of the victim's sixty-three page diary was an abuse of discretion and requires a reversal of Appellant's conviction and sentence. The trial court's admission of the entire narrative as a single statement by the victim was unfairly prejudicial and proved to be critical to the State's case given the lack of any physical evidence linking Appellant to his wife's death and given the State's failure to present any witnesses who had ever observed Appellant threaten or physically abuse her. Therefore, Appellant is entitled to a new trial. On remand, each declaration and remark from the diary sought to be admitted into evidence under the hearsay rules must be separately determined to be admissible in accordance with this opinion.[38]

## C.

Although we reverse Appellant's conviction and sentence on the ground that the trial court improperly admitted into evidence the victim's sixty-three page diary, we will briefly address the trial court's ruling admitting into evidence the victim's statements to others. As indicated above, the trial court admitted into evidence statements made by the victim to her children, Zachary and Kristy, and to Kristy's boyfriend, Jimmy Schrecken-

goest, that Appellant threatened her with a gun and attempted to strangle her with a cord. The trial court ruled, without explanation, that the statements were admissible under this Court's decision in *State v. Sutphin*, 195 W.Va. 551, 466 S.E.2d 402 (1995).

The issue in *Sutphin* involved the admissibility of testimony by a trial witness regarding what he was told by the victim. More specifically, the victim told the witness (her father) that the defendant threatened to kill her if she ever left him again. On appeal from the defendant's conviction for the victim's murder, we identified the issue as hearsay within hearsay-that is, "a statement made by a declarant that repeats or addresses a statement made by another declarant." 195 W.Va. at 560, 466 S.E.2d at 411 (*citing* Franklin D. Cleckley, *Handbook on Evidence for West Virginia Lawyers* § 8–5 (3d ed.1994)). Accordingly, we analyzed the issue pursuant to W.Va. R. Evid. 805 and determined that under that rule, "hearsay included within hearsay is admissible if each level of hearsay comports with one of the exceptions to the hearsay rule." *Id.*, at syl. pt. 4.

Ultimately, in *Sutphin*, we concluded that the threatening statement made by the defendant to the victim was actually non-hearsay under W.Va. R. Evid. 801(d)(2) and, alternatively, if the defendant's statement did not qualify as non-hearsay under Rule 801(d)(2), it was nevertheless admissible under W.Va. R. Evid. 803(3), the "state of mind" exception. In examining the recitation of the defendant's threat by the victim to her father (a trial witness), we determined that statement was admissible under W.Va. R. Evid. 803(2), the "excited utterance" exception to the hearsay rules.

■ In this case, the trial court failed to set forth any findings, conclusions or other

---

38. We are aware of several cases in which courts have excluded statements included in the diaries of unavailable declarants because they are highly prejudicial or failed to satisfy the hearsay exceptions under which they were being offered. *See e.g., Phillips v. Potter*, 2009 WL 3271238 (W.D.Pa.); *People v. Thompson*, 25 Misc.3d 1241(A), 2009 WL 4850604 (N.Y.Sup.); *Tracy v. Tracy*, 2009 WL 1593747 (Cal.App. 2 Dist.); *People v. Wlasiuk*, 32 A.D.3d 674, 821 N.Y.S.2d 285 (N.Y.App.Div.2006); *Young v. HAC, LLC*, 24 P.3d 1142 (Wyo.2001). These cases may be instructive to the parties on remand. We are also aware of at least two cases in which the court admitted diaries in their entirety. *See United States v. Seale*, 600 F.3d 473 (5th Cir.), *cert. denied by*, —— U.S. ——, 131 S.Ct. 163, 178 L.Ed.2d 97 (2010) and *Seattle–First Nat. Bank v. Randall*, 532 F.2d 1291 (9th Cir.1976).

reasoning in support of its very general ruling that the victim's statements to her children and Jimmy Schreckengoest were admissible under *Sutphin.* It is well settled that a trial court's evidentiary rulings are subject to appellate review under an abuse of discretion standard. *Rodoussakis,* at syl. pt. 4, 204 W.Va. at 61, 511 S.E.2d at 472. *See In Interest of Tiffany Marie S.,* 196 W.Va. 223, 234, 470 S.E.2d 177, 188 (1996) (stating that this Court "will interfere with a circuit court's ruling on evidentiary matters only if [a party] demonstrates an abuse of the circuit court's substantial discretion" (citation omitted)); and *Gentry v. Mangum,* 195 W.Va. 512, 518, 466 S.E.2d 171, 177 (1995) (indicating that "a reviewing court gives special deference to the evidentiary rulings of a circuit court" (footnote omitted)). A trial court must therefore set forth its reasoning for its evidentiary rulings so that, on appeal, this Court may conduct a meaningful review thereof. "This Court cannot perform its function unless the circuit court's [ruling] contains both the factual and legal bases for its ultimate conclusion." *Nestor v. Bruce Hardwood Flooring, L.P.,* 206 W.Va. 453, 456, 525 S.E.2d 334, 337 (1999). *Cf. Fayette County Nat. Bank v. Lilly,* 199 W.Va. 349, 354, 484 S.E.2d 232, 237 (1997) (stating that "the circuit court's order must provide clear notice to all parties and the reviewing court as to the rationale applied in granting or denying summary judgment"). In the case *sub judice,* the trial court's ruling with regard to the admissibility of the victim's statements to others was clearly insufficient for meaningful appellate review. Therefore, we find the trial court committed error in admitting those statements into evidence.

## IV.   Conclusion

■   Based upon all of the above,[39] it is hereby ordered that Appellant's conviction of first degree murder in the Circuit Court of Wood County is hereby reversed, and this case is remanded for a new trial consistent with this opinion.

Reversed and remanded.

Chief Justice WORKMAN concurs and reserves the right to file a concurring opinion.

WORKMAN, Chief Justice, concurring:

I concur in the result reached in this opinion. I write separately merely to emphasize a point articulated by the majority in footnote 32 of the opinion. Specifically, in holding that a trial court must determine the admissibility of each individual declaration or remark, the majority states in that footnote: "[A] trial court must determine if the offered declaration or remark made by the unavailable declarant is hearsay and, if it is, whether it falls within a firmly rooted hearsay exception or has a particularized guarantee of trustworthiness." I agree.

In a dissent to *State v. Phillips,* 194 W.Va. 569, 461 S.E.2d 75 (1995) (Workman, J., dis-

---

**39.** Appellant raises two other issues as assignments of error: First, that the trial court erred by admitting into evidence alleged acts of violence by Appellant towards the victim pursuant to W.Va. R. Evid. 404(b), and second, that Appellant's conviction was against the manifest weight of the evidence. Though generally raised as assignments of error, Appellant fails to argue or adequately brief the issues in this appeal. "In the absence of supporting authority, we decline further to review [these] alleged error[s] because [they] have not been adequately briefed." *State v. Allen,* 208 W.Va. 144, 162, 539 S.E.2d 87, 105 (1999). As we stated in *State, Dept. of Health v. Robert Morris N.,* 195 W.Va. 759, 765, 466 S.E.2d 827, 833 (1995), " '[a] skeletal "argument," really nothing more than an assertion, does not preserve a claim.... Judges are not like pigs, hunting for truffles buried in briefs.' " (*quoting United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir. 1991)). Furthermore, this Court has adhered to

the rule that "[a]lthough we liberally construe briefs in determining issues presented for review, issues ... mentioned only in passing but are not supported with pertinent authority, are not considered on appeal." *State v. LaRock,* 196 W.Va. 294, 302, 470 S.E.2d 613, 621 (1996). *Accord State v. Adkins,* 209 W.Va. 212, 216 n. 5, 544 S.E.2d 914, 918 n. 5 (2001); *State v. Easton,* 203 W.Va. 631, 642 n. 19, 510 S.E.2d 465, 476 n. 19 (1998); *State v. Lilly,* 194 W.Va. 595, 605 n. 16, 461 S.E.2d 101, 111 n. 16 (1995) (noting that "appellate courts frequently refuse to address issues that appellants ... fail to develop in their brief."). *See also Ohio Cellular RSA Ltd. Partnership v. Board of Pub. Works of West Virginia,* 198 W.Va. 416, 424 n. 11, 481 S.E.2d 722, 730 n. 11 (1996) (refusing to address issue on appeal that had not been adequately briefed).

We note that because we reverse Appellant's conviction and sentence on other grounds, we need not address these issues in any event.

senting), I admonished the majority for failing to determine, as a preliminary matter, whether certain out-of-court statements by an unavailable witness were hearsay before determining whether those statements were admissible as an exception to the hearsay rule. As I explained in my dissent, the statements in *Phillips* were not hearsay under West Virginia Rule of Evidence 801(c), as they were not offered into evidence to prove the truth of the matter asserted. *Id.* at 591, 261 S.E.2d at 97. The majority in *Phillips*, however, omitted this important first step in its analysis and instead proceeded directly to analyze whether the statements fell within any of the hearsay exceptions found in West Virginia Rule of Evidence 803. I found error with this approach and dissented on that ground, among others.

The instant opinion authored by Justice McHugh has succinctly and correctly clarified the proper analytical approach in this context. Thus, I write merely to remind the trial court on remand to engage in this all-important first step of the hearsay analysis. I take no position as to which, if any, of the statements at issue in the instant case fall outside of the hearsay category. I simply wish to emphasize that the relevant exceptions to the hearsay rule only apply when the statements at issue are, in fact, hearsay.