**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**


*In re* **H.C. and J.C.**

**No. 21-0411** (Webster County 2020-JA-50 and 2020-JA-51)


**MEMORANDUM DECISION**


Petitioner Mother S.C., by counsel Howard J. Blyler, appeals the Circuit Court of Webster County's April 21, 2021, order terminating her parental rights to H.C. and J.C.[1] The West Virginia Department of Health and Human Resources ("DHHR"), by counsel Patrick Morrisey and James Wegman, filed a response in support of the circuit court's order. The guardian ad litem, Mary Elizabeth Snead ("guardian"), filed a response on behalf of the children also in support of the circuit court's order. On appeal, petitioner argues that the circuit court erred in terminating her parental rights without granting her an improvement period and without imposing a less-restrictive dispositional alternative.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

In October of 2020, the DHHR filed an abuse and neglect petition against the parents alleging that they mentally and physically abused then thirteen-year-old H.C. and eleven-year-old J.C. and failed to protect H.C. from sexual abuse by a relative. According to the DHHR, the parents engaged in excessive corporal punishment, such as pouring salt in the children's eyes and spanking them to the point of drawing blood. Petitioner also allegedly locked the children in their bedrooms or out of the house as punishment. The DHHR further maintained educational neglect of the children and that the parents engaged in domestic violence and marijuana use in the presence of the children. The petition noted that the children were adopted by petitioner and her husband after

---

[1]Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R. II*, 230 W. Va. 731, 742 S.E.2d 419 (2013); *State v. Brandon B.*, 218 W. Va. 324, 624 S.E.2d 761 (2005); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990).

1

suffering abuse and neglect from their biological parents in a prior case. It also noted that neither child wanted to be placed with any of the parents' relatives. Thereafter, petitioner waived the preliminary hearing, and although the circuit court ordered supervised visitations, the children refused to visit with the parents. That same month, petitioner filed a motion for an improvement period.

The circuit court held a contested adjudicatory hearing in December of 2020, and the DHHR presented the testimony of several witnesses. Petitioner's mother ("grandmother") testified that H.C. walked several miles to the grandmother's home because she was scared of petitioner and that at another visit, J.C. showed her severe bruising on his buttocks. J.C. told the grandmother that petitioner caused the bruising by beating him with a paddle. The grandmother testified that J.C. was scared of petitioner and knew petitioner would be angry that the grandmother saw the bruising. Next, a Child Protective Services ("CPS") worker testified that both children reported the parents' marijuana use in their presence and observed drug paraphernalia in the home. A second worker testified that H.C. reported being locked in her room for thirty days without a bed and was only allowed to come out to eat and use the bathroom. H.C. reported another time when she was locked in her room for three days and only given water to drink. H.C. stated that she was forced to urinate in a bottle. This worker also stated that H.C. described sexual abuse by petitioner's father ("grandfather") and that petitioner was aware of the abuse. This worker testified that when she interviewed J.C., he corroborated much of the same information that was provided by H.C.

A third CPS worker testified that she investigated the initial referral and was the first contact with the children. Initially, petitioner did not want her to speak to the children but eventually allowed it. H.C. was afraid to speak to the worker and stated that petitioner threatened her if she cooperated with CPS. H.C. reported instances of abuse such as being locked outside in her underwear one night and having to sleep in the car. She reported being spanked to the point of bleeding and that petitioner told her she had a demon inside of her. When the worker interviewed J.C., he also stated that petitioner told him "CPS was bad" and that he was not to talk to the worker. He told the worker not to leave because petitioner would hurt him "real bad" when she left. He also disclosed being spanked by petitioner and that he was embarrassed that he was illiterate. The worker stated that when she interviewed petitioner, petitioner admitted she had failed to home school the children recently and had not acquired the "books and stuff." Petitioner denied all of H.C.'s claims but admitted to some allegations of domestic abuse with the father. The worker explained that she interviewed the father last, and he admitted that petitioner could be "excessive when she spanks" and confirmed that petitioner locked H.C. outside in her underwear. The father further admitted to arguments with petitioner and damaging a door during an altercation. The worker stated that after all of the interviews, she determined the children were not safe in the home and that removal was necessary. While removing the children, the worker testified that petitioner told her not to place H.C. with petitioner's parents because the grandfather had been molesting H.C.

A child forensic interviewer testified regarding her interviews with H.C. and J.C. She stated that J.C. disclosed cruel and strange punishments such petitioner pouring salt in their eyes and petitioner forcing the siblings to poke forks into each other's ears. J.C. confirmed that the parents engaged in domestic violence and would blow marijuana smoke into his face. He also reported being locked in his room for days and being forced to use a bottle to urinate, which corroborated

2

H.C.'s statements of being locked in her room. During H.C.'s interview, she confirmed J.C.'s disclosures and stated that petitioner was "the judge and delivered the sentence" when she grabbed the saltshaker and poured it into the children's eyes. H.C. also reported that petitioner forced her to eat rotten brussels sprouts out of a trash bin. H.C.'s disclosures were also consistent with what the CPS workers testified to regarding her being locked in her room, her molestation by the grandfather, and the educational neglect. H.C. stated that the "whole family knew" about the molestation because the mother told everyone.

Finally, a state trooper testified regarding the allegations of the grandfather's molestation of H.C. He stated that petitioner admitted that she was aware of the sexual molestation and had known about it for "years." In fact, the trooper stated that the grandfather admitted to the molestation to another trooper investigating the crime. Nevertheless, petitioner failed to file criminal charges or report the sexual abuse and continued to allow H.C. to stay with the grandfather. It was not until near the children's removal that petitioner addressed the issue and cooperated with law enforcement. Neither parent testified. After the close of evidence, the circuit court found clear and convincing evidence that the children were abused and neglected and adjudicated the parents as abusing parents.

Prior to the final dispositional hearing, the guardian filed her report detailing the children's welfare. The report stated that J.C. suffered so much trauma that he was hospitalized for suicidal and homicidal ideations in December of 2020, but was released to a specialized foster home in January of 2021. Due to J.C.'s violent outbursts, the children were separated, but exercised sibling visitation. H.C. was placed in another foster home and had bonded with another girl in the home. Both children were diagnosed with various mental health issues related to the trauma suffered while in the parents' care. Additionally, both children had been severely educationally neglected and had reading and math levels far below the requirements for their ages.

The circuit court held a dispositional hearing over the course of two days in April of 2021. The DHHR presented the testimony of several witnesses, including the DHHR worker, service providers, and a state trooper, among others. Testimony established that petitioner failed to complete parenting education classes, as she missed five of the fifteen classes and was late for one. The provider opined that the parents made no progress as they maintained that they had done nothing wrong and believed that their discipline was appropriate. Petitioner also blamed H.C. for the allegations and claimed the children were being manipulated by the DHHR resulting in the case being unfair. Testimony also established that the parents failed to fully cooperate with the CPS workers and were "hard to get a hold of." The parents also failed to follow drug screening protocol and petitioner continued to blame H.C. for the case, stating that H.C. was the "instigator" of it all. Petitioner also told the CPS worker that she believed the worker "brainwashed" the children. The worker stated that the children expressed their wishes in favor of the termination of the parents' parental rights.

The father testified and denied all wrongdoing and the allegations in the petition. He admitted to having arguments with petitioner and explained that the salt water in the children's eyes was a home treatment for pink eye. Petitioner testified and likewise denied all allegations but conceded that she spanked and paddled the children. She also confirmed that she had locked the children in their rooms as punishment for three days but denied that they had to relieve themselves

in bottles or buckets. Petitioner admitted to seeing unusual behavior between H.C. and the grandfather in 2015 and when she spoke to H.C. about it, H.C. disclosed sexual abuse. Petitioner stated that she reported this information to the father but ultimately, they did not believe H.C. and thought she was "deflecting." Despite this, petitioner did not report the abuse to anyone, contact the police, nor take any action to protect H.C. from the grandfather's sexual abuse until October of 2020.

At the close of evidence, the court found that that parents denied domestic violence in the home while also admitting to acts that would constitute domestic violence. The court made special note that petitioner knew of H.C.'s sexual abuse since 2015, yet did nothing to protect the child from further abuse. The court concluded that neither parent accepted "any responsibility in this matter and has continued to minimize their conduct and blame each other and the children." The circuit court denied petitioner's request for an improvement period, finding that she failed to show that she was likely to improve and that there were no services that could correct these circumstances of abuse and neglect. Ultimately, the circuit court found that there was no reasonable likelihood that the conditions of abuse and neglect could be corrected in the future. Accordingly, the circuit court terminated petitioner's parental rights. Petitioner appeals the April 21, 2021, dispositional order.[2]

The Court has previously established the following standard of review in cases such as this:

> "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011).

On appeal, petitioner argues that the circuit court erred in terminating her parental rights without first granting her an improvement period. In support, petitioner contends that the CPS worker testified at the dispositional hearing that she had complied with all of the DHHR's services as she submitted to drug screens, attended counseling, and completed some parenting education classes. Although petitioner concedes that she did not fully admit to all allegations contained in the petition, petitioner admitted to some. Petitioner avers that she did not admit to allegations that

---

[2]The father's parental rights were also terminated below. The permanency plan for J.C. is adoption by a foster family. The permanency plan for H.C. is permanent guardianship with another foster family.

4

did not take place. As petitioner testified that she would comply with the terms and conditions of an improvement period, petitioner claims that there was no question that she was capable of fully complying with an improvement period.[3]

West Virginia Code § 49-4-610(2)(B) provides that the circuit court may grant a parent a post-adjudicatory improvement period when the parent "demonstrates, by clear and convincing evidence, that the [parent] is likely to fully participate in the improvement period." "This Court has explained that 'an improvement period in the context of abuse and neglect proceedings is viewed as an opportunity for the . . . parent to modify his/her behavior so as to correct the conditions of abuse and/or neglect with which he/she has been charged.'" *In re Kaitlyn P.*, 225 W. Va. 123, 126, 690 S.E.2d 131, 134 (2010) (citation omitted). Finally, the circuit court has discretion to deny an improvement period when no improvement is likely. *In re Tonjia M.*, 212 W. Va. 443, 448, 573 S.E.2d 354, 359 (2002).

Most importantly, we have explained that

[i]n order to remedy the abuse and/or neglect problem, the problem must first be acknowledged. Failure to acknowledge the existence of the problem, i.e., the truth of the basic allegation pertaining to the alleged abuse and neglect or the perpetrator of said abuse and neglect, results in making the problem untreatable and in making an improvement period an exercise in futility at the child's expense.

*In re Timber M.*, 231 W. Va. 44, 55, 743 S.E.2d 352, 363 (2013) (citation omitted). While petitioner may have complied with some of the DHHR's services, the record clearly shows that petitioner failed to acknowledge the most basic allegations of abuse. Despite evidence that the grandmother witnessed severe bruising on J.C.'s buttocks and H.C.'s consistent disclosures that she had been paddled and spanked to the point of bleeding, petitioner continued to believe that her spanking and paddling of the children was not excessive or inappropriate in anyway. Further, evidence showed that petitioner locked H.C. outside in her underwear, yet petitioner found no problem with this punishment. Additionally, petitioner admitted to leaving the children locked in their bedrooms for at least three days. Shockingly, petitioner admitted that she had known of H.C.'s disclosure of sexual abuse by the grandfather since 2015 and did nothing to protect the child until October of 2020, and thus exposed the child to years of potential further abuse. The circuit court took into account the discrepancies between the parents' testimonies and the consistencies between the disclosures of the children during interviews and to CPS workers and found the parents'

---

[3]Petitioner briefly mentions that the circuit court failed to consider the testimony of the parents' older daughter. However, petitioner fails to explain this argument or otherwise show how the circuit court erred. As such, this issue is inadequately briefed for appeal, both in terms of complying with this Court's rules and in terms of attempting to establish an alleged error by the circuit court. Specifically, petitioner fails to cite to a single legal authority that would entitle her to relief in this regard, which is in violation of Rule 10(c)(7) of the West Virginia Rules of Appellate Procedure. As this Court has held, "[a] skeletal 'argument,' really nothing more than an assertion, does not preserve a claim . . . . Judges are not like pigs, hunting for truffles buried in briefs." *State v. Kaufman*, 227 W. Va. 537, 555 n.39, 711 S.E.2d 607, 625 n.39 (2011) (citation omitted).

testimony and explanations incredible. As this Court has long held, "[a] reviewing court cannot assess witness credibility through a record. The trier of fact is uniquely situated to make such determinations and this Court is not in a position to, and will not, second guess such determinations." *Michael D.C. v. Wanda L.C.*, 201 W. Va. 381, 388, 497 S.E.2d 531, 538 (1997).

Indeed, even without considering the specific details or other facts that petitioner disputes, the above instances are those to which petitioner *admitted* to and these instances alone show that petitioner knowingly inflicted emotional and physical abuse upon the children. Regardless, consistent with this Court's prior holdings, petitioner's failure to acknowledge the conditions of abuse and neglect, and especially the extent thereof, render those conditions untreatable, and, therefore, any improvement period would have been an "an exercise in futility at the child[ren]'s expense." *Timber M.*, 231 W. Va. at 55, 743 S.E.2d at 363. Accordingly, we find no error in the circuit court's denial of petitioner's improvement period.

Finally, we find no error in the circuit court's termination of petitioner's parental rights. West Virginia Code § 49-4-604(c)(6) provides that circuit courts are to terminate parental rights upon finding that there is "no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected in the near future" and that termination is necessary for the children's welfare. West Virginia Code § 49-4-604(d)(5) provides that a circuit court may determine that there is no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected when

> [t]he abusing parent or parents have repeatedly or seriously injured the child physically or emotionally, or have sexually abused or sexually exploited the child, and the degree of family stress and the potential for further abuse and neglect are so great as to preclude the use of resources to mitigate or resolve family problems, or assist the abusing parent or parents in fulfilling their responsibilities to the child.

Here, the record clearly shows that both children have disclosed extensive emotional and physical abuse by petitioner over the course of several years. Both children refused visits with the parents and both stated that they wished to never have contact with them again. The children disclosed various forms of abuse, including embarrassing and cruel punishments such as being locked out of the house in only their underwear, relieving themselves in bottles while being locked in rooms, and being spanked and paddled to the point of bruising and bleeding. Evidence presented at the dispositional hearing showed that the parents admitted to constant arguments and fights and petitioner specifically blamed H.C. for the child abuse and neglect proceedings, calling her an "instigator." Notably, petitioner admitted that she did not believe H.C. about her disclosure of sexual abuse and chose to believe that the child was "deflecting" to avoid other punishments. Moreover, the guardian's report indicated that both children suffered such egregious abuse that they had to be placed in separate placements, receive therapy, and given extra schooling for the severe educational neglect. Given these issues, it is apparent that "the degree of family stress and the potential for further abuse and neglect are so great as to preclude the use of resources to mitigate or resolve family problems, or assist the abusing parent or parents in fulfilling their responsibilities to the child[ren]." *Id*. Accordingly, we find that ample evidence supported the circuit court's finding that there was no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected in the near future.

Insomuch as petitioner argues that she was entitled to a less-drastic dispositional alternative, we have held that

> "[t]ermination of parental rights, the most drastic remedy under the statutory provision covering the disposition of neglected children, [West Virginia Code § 49-4-604] may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood under [West Virginia Code § 49-4-604(d)] that conditions of neglect or abuse can be substantially corrected." Syllabus point 2, *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980).

Syl. Pt. 5, *In re Kristin Y.*, 227 W. Va. 558, 712 S.E.2d 55 (2011). Based on the evidence set forth above, we find no error in the circuit court's termination of petitioner's parental rights.

For the foregoing reasons, we find no error in the decision of the circuit court, and its April 21, 2021, order is hereby affirmed.

Affirmed.

**ISSUED**: January 12, 2022

**CONCURRED IN BY**:

Chief Justice John A. Hutchison
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice Evan H. Jenkins
Justice William R. Wooton

7